## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

CASE NO  97-2806-CIV-HUCK
MAGISTRATE JUDGE BROWN

MARK OSTERBACK, et al ,

                Plaintiffs,

v

MICHAEL W  MOORE, et al ,

                Defendants.

_____/

NIGHT BOX
FILED

SEP 10 2001

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, MICHAEL W. MOORE, Secretary of the Florida Department of Corrections, *et al* , for their Motion for Summary Judgment, hereby allege

1.    There is no material issue of fact in dispute.

2    Plaintiffs fail to state a cause of action under 42 U.S C  § 1983 as their allegations do not establish cruel and unusual punishment.

3.    Plaintiffs cannot establish a basis for declaratory relief or injunction. They are unable to show that a declaratory judgment is necessary in order to

1

protect their constitutional and statutory rights, they are unable to establish irreparable harm, inadequate remedy at law or that an injunction would be in the public interest.

4       Additionally, Plaintiffs are unable to establish that the Defendants are the ones responsible for any alleged Eighth Amendment violations perpetrated on any of the Plaintiffs

## UNDISPUTED FACTS

Close Management (CM) is the confinement of an inmate apart from the general population for reasons of security or the order and effective management of the institution, where the inmate through his or her own behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others   (Rule 33-601 800(1)(c), F.A.C.) ( A copy of the Rule is appended as Ex. 3)   Three levels are associated with CM, with CM 1 being the most restrictive single cell housing level and CM 3 being the least restrictive housing of the three CM levels. (Rule 33-601 800(2), F A.C )

An inmate may be placed on CM 1 for one of the reasons listed in Rule 33-601 00(2)(a)2, F.A C , may be placed on CM 2 for one of the reasons listed in Rule 33-601 800(2)(b)2, F A C. and may be placed in CM 3 for the reasons listed in Rule

2

33-601 00(2)(c)2, F A C.

Plaintiffs' Second Amended Complaint challenges certain conditions of confinement in CM, including little contact with others, not being permitted to work or attend programs, limitations on visitation, lack of religious programs, lack of library access, inability to listen to radio or watch television and limits on out-of-cell recreation (Second Amended Complaint [hereafter "Complaint"], para 203). Plaintiffs allege that Defendants knew and know that CM policies exacerbate the mental disorders of class members, who remain virtually untreated (Complaint, para 209, 211) They allege that double celling and social isolation increase the incidence of mental health problems and violence. (Complaint, paras. 214-15) It is alleged that physical force and chemical agents are used on inmates with mental health problems. (Complaint, para. 217). Plaintiffs contend that CM conditions cause a decline in general physical health of which defendants are aware (Complaint, para. 220, 225) It is alleged that CM conditions of confinement increase the likelihood of mental illness (Complaint, para 222) Plaintiffs also allege that Defendants refuse to take any action to alleviate the conditions of the CM system (Complaint, para. 226). Plaintiffs have admitted that, "[t]he Complaint does not allege that any specific Rule of the Department of Corrections, or any particular portion of any Rule of the Department of Corrections, is unconstitutional, either on its face or as applied "

Plaintiff's Response to Interrogatory dated May 8, 2001.  (Appended hereto as Ex
1).

The facts with regard to the issues raised show that Close Management is
governed by rules promulgated under the Florida Administrative Code.  These rules
were substantially changed on February 1, 2001 to eliminate specific time periods,
provide for additional reviews for the purpose of reducing CM levels to the least
restrictive, if appropriate, and providing that inmates shall be released from CM at 6
month reviews by the State Classification Office unless there are specific reasons not
to do so.  See 33-601.800(2),(15)(a)(d), former rule  33-601.804-809.  (A copy of the
former rule is appended as Ex. 2).  Substantial additional changes were made pursuant
to a Memorandum of the Deputy Secretary dated July 20, 2001   (Appended hereto
as Ex. 4)

The Florida Department of Corrections, as of the time the Second Amended
Complaint was filed, had a number of institutions housing CM inmates, (See
Complaint) and is currently in the process of reducing this number to three
institutions, pursuant to the Department's Close Management Consolidation Plan.
(CM Plan) (Appended hereto as Ex. 6).

The present situation is:

CM 1 inmates are permitted one two-hour non-contact visit every 30

4

days, CM 2 inmates are permitted one such visit every 14 days and CM 3 inmates are permitted one two-hour contact visit every 14 days  (Ex  4, para. 6) This is a significant increase over what was allowed under the rule of February 1, 2001  (Rule 33-601.800(9)(b)7, (c)3, (d)1). CM 1 inmates are allowed 1 telephone  call every 30 days, CM 2 inmates, 1 call every 14 days and CM 3 inmates 1 call every 7 days. (Ex. 4, para. 7)   CM 1 and 2 inmates may be allowed access to the day room area for social purposes and television up to 2 days per week (4 hours) for CM 2 inmates and up to 5 days per week (4 hours) for CM 3 inmates. (Ex  4, para. 8).

In-cell educational opportunities are available for CM inmates.  Also, wellness services for CM inmates are enhanced by providing cell-front tutoring in areas such as tobacco cessation and wellness education. ( Ex  4, paras. 10, 11)  CM inmates are allowed in participate in cell-side religious ceremonies, may possess religious literature and have access to a spiritual advisor or clergy.  (Rule 33-601.800(8)(h). Increased religious volunteer participation will be recruited, where possible.  (Ex. 4, para  12)  All CM inmates are permitted up to 3 soft cover books per week from the library, 1 magazine subscription (up to 4 issues) and 1 newspaper subscription (up to 4 issues)  (Ex. 4, para. 4).  CM inmates at all levels may possess a "Walkman" type radio  (Ex. 4, para 3)  Television access is as previously explained. (Ex. 4, para  8)  Physicians who treat inmates have noticed no decline in physical health due to CM

confinement (Ex 5, p 19)

Further, no inmate may be placed into CM without having been evaluated by the senior psychologist, being reviewed by the Institutional Classification Team (ICT) and by the State Classification Office (SCO) (Rule 33-601 800(3)) Additionally, an ICT member (that is, the warden or assistant warden, classification supervisor and chief of security) reviews each close management inmate at least once every week for the first 60 days and once every 30 days thereafter for the purpose of reducing the inmates status to the lowest management level or returning the inmate to general population as soon it is determined that the inmate is no longer a threat or danger to the inmate population or security Additionally, at least once every six months the SCO conducts an onsite interview with each inmate, reviews all reports prepared by the ICT concerning the inmate's close management status and determines if there are safety and security issues sufficient to require maintaining the inmate at the current level or at a lower level of management. If such specific reasons are not found, the inmate is required to be immediately released, pursuant to the applicable rule (Rule 33-601.800(15), F.A C ).

When necessary, inmates are provided with inpatient mental health treatment at a crisis stabilization care unit, a transitional care unit or, if necessary hospital care at the Department of Corrections Mental Health Institution (CMHI) 33-404 103,

404 201    Health services are governed by Chapter 33-401 of the Florida Administrative Code and Mental Health Services are governed by Chapter 33-404.103 thereof

Further, and in addition thereto, there is in place a Close Management Consolidation Plan, consolidating all CM inmates into three institutions, Florida State Prison, Santa Rosa Correctional Institution and Charlotte Correctional Institution. This will enable professional and security staff to be transferred to the institutions concerned so that a higher level of medical care, mental health care and security will be available. All inmates who exhibit symptoms of serious mental illness who do not require inpatient care will be housed at Florida State Prison, which will be staffed with a substantially enhanced professional mental health staff to ensure necessary treatment   (See, Ex. 6)

Thus, since the entry of the current Department Administration, Defendants have substantially changed the CM Rules to provide for greater privileges, additional reviews to ensure that only appropriate inmates are held in close management and that they are held at appropriate levels. They have provided further privileges and sensory input to all CM levels to assure both motivation to  cease the behavior which led to CM placement and sufficient stimulation to maintain and improve physical and mental health

7

## MEMORANDUM OF LAW.

### A.  Summary Judgment Standard

The Court may grant Summary Judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed R.Civ.P. 56(c).  As the moving party, Defendants have the initial responsibility to demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Cattret, 477 U.S. 317, 323,325 (1986)  In Celotex, the Supreme Court discussed the standard for granting summary judgment, stating

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial.  The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [the] case with respect to which [that party] has the burden of proof

Id. at 322-23 (emphasis added) (quoting Fed R.Civ.P. 56(c))

"A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F 2d 1573, 1577 (11th Cir 1990). If, after the movants make their showing, the nonmoving parties bring forth evidence in support of their position on an issue for which they bear the burden of proof at trial that "is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, 477 U.S 242, 249-250 (1986) (citations omitted).

The changes already instituted by the defendants make the entry of injunctive relief moot, as will be subsequently explained, and, therefore, declaratory relief is barred by the Eleventh Amendment.

Defendants submit there is no genuine issue of material fact, and summary judgment should be granted as a matter of law, as Plaintiffs have no evidence that is significantly probative of any material issue of fact.

### B. Plaintiffs have failed to establish a claim under 42 U.S.C. § 1983

In order to state a claim for relief under Title 42 United States Code, Section 1983, the Plaintiff must allege that the Defendants deprived her of a right, privilege, or immunity secured by the Constitution or laws of the United States, and that the Defendants acted under color of state law. See McKinley v. Kaplan, 177 F 3d 1253,

1256 (11th Cir 1994); <u>Albajon v Gugliotta</u>, 72 F. Supp 2d 1362, 1369 (S D. Fla. 1999)

First, the law is clear that the courts should be extremely reluctant to get involved in the issues of prison reform·

> A second principle identified in <u>Martinez</u>, [1] however, is the recognition that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." Id., at 405, 94 S.Ct , at 1807   As the <u>Martinez</u> Court acknowledged, "the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree "   Id., at 404-405, 94 S.Ct., at 1807.   Running a prison [482 U S. 85] is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government   Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.   Where a state penal system is involved, federal courts have, as we indicated in <u>Martinez</u>, additional reason to accord deference to the appropriate prison authorities. <u>See</u> id., at 405, 94 S.Ct , at 1807.

<u>Turner v. Safley</u> 107 S.Ct 2254, 2259, 482 U S. 78, 84-85 (1987), <u>See also</u> <u>Freeman v Fuller</u>, 623 F. Supp. 1224, 1226 (SD Fla 1985)

To the extent that conditions are restrictive, or even harsh, they are part of the penalty that criminals pay for their offenses against society. <u>Rhodes v Chapman</u>, 452

---

[1] Referring to <u>Procunier v Martinez</u>, 416 U.S 396, 94 S Ct 1800, 40 L.Ed 2d 224 (1974)

U S 337, 347, 101 S Ct. 2392, 2399, 69 L Ed.2d 59 (1981); <u>Hargrove v. Henderson</u>, 1996 WL 457516, 6 (MD Fla 1996)   This is not a matter for judicial review or concern unless the evidence demonstrated that conditions are so extreme as to violate basic concepts of humanity and deprive inmates of a minimal level of life's basic necessities   <u>Young v. Quinlan</u>, 960 F 2d 351, 364 (3d Cir. 1992)   The Eighth Amendment does not give a federal court a roving commission to impose its own notions of enlightened policy. <u>Rummel v Estelle</u>, 445 U.S 263, 285, 100 S Ct 133, 1145, 63 L.Ed.2d 382 (1980) (Stewart, J , concurring).

The general concept of segregating inmates for security reasons is a well established and penologically justified practice and may be a necessary tool. <u>See Id</u> at 364; <u>Madrid v. Gomez</u>, 889 S Supp 1146, 1261 (N.D. Cal. 1995).  Segregated detention is not cruel and unusual punishment <u>per se</u> as long as the conditions of confinement are not foul, inhuman or totally without penological justification. <u>Young</u> at 364.  Solitary confinement, in and of itself, is not cruel and unusual punishment "Within the broad limits set by the Eighth Amendment, a state may legitimately make an inmate's confinement progressively more onerous in response to his breach of prison rules, and may, contrariwise, make his conditions of confinement more pleasant in response to good behavior." <u>Johnson v. Anderson</u>, 370 F. Supp 1373, 1384 (D. Del. 1974). "Indeed, failure to segregate dangerous inmates from their less

dangerous counterparts may constitute cruel and unusual punishment for the less dangerous inmates." Parker v  Cook, 642 F 2d 865, 873 (5th Cir. 1981).

The bar is high to prove an Eighth Amendment violation, especially where courts are forbidden to grant or approve prospective relief unless it is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation. See 18 U S C  § 3626(a)(1)(A), (b)(2), (b)(3); Inmates of Suffolk County Jail v  Rouse, 129 F.3d 649, 654 (1st Cir. 1997)

### C.  Single and Double-Celling and Alleged Isolation.

"[S]o long as the conditions of isolation cannot be characterized as foul, inhuman or in violation of basic concepts of decency, solitary confinement per se is not cruel and unusual punishment." Laaman v. Helgemoe, 437 F. Supp. 269, 310 (D N.H   1977)  "Segregated   confinement   and   its   inescapable accompaniments–isolation   from   companionship,   restriction   of   intellectual stimulation, and prolonged inactivity–do not in themselves amount to cruel and unusual punishment, even if for a prolonged duration." Capps v. Atiyeh, 559 F. Supp. 894, 906 (D. Or. 1982)  "If the State furnishes its prisoners with reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety, so as

12

to avoid the imposition of cruel and unusual punishment, that ends its obligation under Amendment Eight." <u>Hargrove v Henderson</u>, 1996 WL 467516, 8 (M D. Fla 1996)

With regard to double-celling, it has been held that, "[t]he psychological and physical effects of segregation are doubtlessly compounded when inmates are crowded into small cells  But there is not enough evidence in the record for me to find that the double-celling in segregation denies the inmates any of life's basic needs." <u>Id.</u> at 907.  Thus, it is understandable why a decree declaring double-celling not "permissible" under federal constitutional law was required to be vacated. <u>Nelson v  Collins</u>, 659 F.2d 420 (4th Cir. 1981) (en banc)


### D.  Jobs, Educational Opportunities, Prison Programs,

"[A]s the Supreme Court most recently declared on <u>Rhodes</u>, deprivations of job and educational opportunities to prisoners do not violate the Constitution; the denials of such opportunities 'do not inflict pain, much less unnecessary and wanton pain; deprivations of this kind simply are not punishments.' 452 U S. at 348, 101 S.Ct At 2400.  If, as this Court has concluded, the State   .  is furnishing the inmates reasonably adequate food, clothing, shelter, sanitation, personal safety, and medical care, its obligations under the Eighth Amendment have been met  <u>See, e g</u>, <u>Madyun</u>

v. Thompson, 657 F.2d 868, 874 (7th Cir 1981); Ramos v Lamm, supra, 639 F 2d at 566-67, Newman v Alabama, supra, 559 F.2d at 291 " Lovell v. Brennan, 566 F. Supp 672, 689 (D. Me 1983)

With regard to access to prison programming, in the context of protective custody, it has been held that, "[a]s the Court of Appeals has observed the life of a Protective Custody inmate 'is, for the most part, boring and filled with inconvenience.' Nadeau v Helgemoe, supra, 561 F.2d at 412. Limited access to prison programs is, however, a necessary incident of plaintiffs' Protective Custody status Id And although it is evident that defendants, at minimal cost and without endangering the safety of these inmates, could take further steps to alleviate the tedium of their confinement by providing more extensive job, educational and recreational opportunities, the Supreme Court has made clear that the failure of defendants to implement these programs does not rise to the level of a constitutional violation Rhodes, supra, 452 U.S at 348, 101 S Ct At 2400." Lovell, 566 F Supp. at 691

Here, where Close Management inmates are permitted, by their behavior, to "earn" their way to a job, greater educational opportunities and increases in programming opportunities, which exist at the CM1 level and which are substantial at the CM2 and 3 levels, there could be no Eighth Amendment violation

14

**E.  Religious Programming.**

Thus, far, the undersigned have been unable to locate any authority supporting religious programming as an Eighth Amendment right, although religious rights may be enforceable under the First Amendment.  See United States Constitution, Amend. 1, 8

**F.  Access to Reading Material.**

Access to library reading material, although significant in this case, is not a matter for judicial review or concern because there is no indication that denial of reading material is so extreme as to violate basic concepts of humanity and deprive inmates of a minimal level of life's basic necessities.  Young v Quinlan, 960 F.2d 351, 364 (3d Cir. 1992)  Moreover, as previously discussed, inmates do have access to 3 soft cover books per week, a magazine and a newspaper subscription.  (Ex. 4, para  4)

**G.  Denial of Radio and Television Privileges.**

Close Management Inmates, of all levels, may now possess walkman-type radios and listen to them, unless deprived of the privilege by a disciplinary committee  (Ex 4, para. 3)  However, that is policy change as of July 20, 2001  CM

2 and 3 inmates have access to entertainment TV up to 2 or 5 times per week, respectively  (Ex. 4,  para. 8).

Nevertheless, and even if it were assumed that denial of such media privileges could cause some psychological harm, they are still recreational luxuries and not basic human needs and failure to allow Close Management Inmates access to them is not prohibited by the Eighth Amendment   See Manley v Fordice, 945 F. Supp 132, 134, 139 (S.D. Miss. 1996).

## H.  Outdoor Recreation Time.

Close Management Inmates were previously permitted 2 hours of outdoor recreation per week, unless suspended. See, Bass v Perrin, 170 F.3d 1312, 1318 (11th Cir. 1999).  Under the Rules which came into effect on February 1, 2001, CM inmates are now entitled to a minimum of 3 hours per week.  (33-601 800(8)(n), F.A.C ).  The Eleventh Circuit has discussed whether inmates have a liberty interest in this time:

> Nevertheless, the Supreme Court has made clear that there are two circumstances in which a prisoner can be further deprived of his liberty such that due process is required.  The first is when a change in a prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court. See Sandin v. Conner, 515 U S  472, 484, 115 S Ct. 2293, 2300, 132 L Ed.2d 418 (1995); see, e.g., Vitek v. Jones, 445 U S. 480, 492-93, 100 S.Ct. 1254, 1263-64, 63 L Ed.2d 552 (1980) (holding that a prisoner is entitled to due process prior to being transferred to a mental hospital)  The second is when the

state has consistently given a certain benefit to prisoners (for instance, via statute or administrative policy), and the deprivation of that benefit "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life " Sandin, 515 U.S at 484, 115 S.Ct at 2300; see, e.g., Wolff v McDonnell, 418 U S. 539, 558, 94 S Ct 2963, 2976, 41 L.Ed 2d 935 (1974) (prisoners may not be deprived of statutory "good-time credits" without due process); cf. Dudley v Stewart, 724 F.2d 1493, 1497-98 (11th Cir 1984) (explaining how the state creates liberty interests). (footnote omitted)  In the first situation, the liberty interest exists apart from the state; in the second situation, the liberty interest is created by the state.

We conclude that the second situation is present here.  Pursuant to the Florida Administrative Code, prisoners in Close Management are given two hours per week of yard time unless clear and compelling reasons exist to do otherwise.   See Fla.   Admin. Code Ann  r. 33-3.0083(9)(i). Prisoners therefore have a state-created interest in yard time  Cf  Sheley v Dugger, 833 F 2d 1420, 1424 (11th Cir 1987).

Bass v Perrin, 170 F.3d 1312, 1318 (11th Cir  1999)

The case subsequently determined that suspending yard time prior to notifying the inmate of the reasons or providing a hearing was not a deprivation of due process where inmates were subsequently given an opportunity for a full appeal process. Id. at 1318-1319   Indeed, denial of any outdoor exercise time for a period of 70 days (which would have normally been 2 hours per week) has been held not to be an Eighth Amendment violation   Thomas v Ramos, 130 F.3d 754, 762 (7th Cir  1997).

"While an inmate has a limited right to exercise, this right is violated only if 'movement is denied and muscles allowed to atrophy, [or] the health of the individual

is threatened " <u>Women Prisoners of District of Columbia Dept of Corrections v.</u>

<u>District of Columbia</u>, 93 F 3d 910, 927 (C.A D.C. 1996) (quoting <u>French v Owens</u>,

777 F 2d 1250, 1255 (7th Cir. 1985), <u>See also</u>, <u>Grace v. Wainwright</u>, 761 F. Supp

1520, 1524 (M.D. Fla 1991)

It is respectfully submitted that where the Court found that 2 hours of yard time

per week was a state created, but not a federally created, liberty interest, then limiting

yard time to three hours per week of yard time, as required by the rules (unless

suspended for cause) could not be deemed to be cruel or unusual punishment

## I.  Medical and Psychological Care.

### 1.  Medical.

Like other conditions of confinement, medical care provided to inmates is subject to scrutiny under the Eighth Amendment's prohibition against cruel and unusual punishment   <u>Helling</u>, 509 U.S  at ----, 113 S Ct at 2480;  <u>Wilson</u>, 501 U S. at 297, 111 S Ct. at 2323.  This does not mean, however, that every inattention to every medical need implicates the Constitution   Nor does the Eighth Amendment guarantee inmates the best medical care available.  Rather, to establish Eighth Amendment liability, plaintiffs must demonstrate that prison officials are "deliberately indifferent" to "serious" medical needs of inmates. <u>Estelle</u>, 429 U S. at 106, 97 S.Ct. at 292,  Toussaint IV, 801 F.2d at 1111   . .

As discussed above, however, the Supreme Court recently made it clear that the "deliberate indifference" standard requires a showing of culpability that can not be inferred solely from objective conditions

Farmer, 511 U S. at ---- - ----, 114 S Ct at 1979-80.  Rather, it can only be found where the defendant actually knows of, and yet disregards, an excessive risk to inmate health or safety   Id  at ----, 114 S Ct  at 1979
   Accordingly,  to  prove  deliberate  indifference,  plaintiffs  must demonstrate not only that the levels of medical and mental health care are constitutionally inadequate from an objective standpoint--based on either a "pattern of negligent conduct" or "systemic deficiencies"--but also that defendants (1) knew the risk to inmate health that this inadequacy posed, and (2) acted with disregard for this risk   In short, plaintiffs must show that defendants " 'consciously disregard[ed]' a substantial risk of serious harm" to plaintiffs' health or safety.  Id  at ----, 114 S Ct  at 1980    Accidental or inadvertent failure to provide adequate care will not suffice. Ramos, 639 F at 575

Madrid v  Gomez, 889 F.Supp  1146, 1255-56(N D.Cal  1995).

   "In order to file a proper claim, an inmate 'must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'

Estelle, 429 U.S  at 105, 97 S.Ct  At 291, Salazar v  City of Chicago, 940 F.2d 233,

239 (7th cir  1991)  'Deliberate indifference' to the serious medical needs of prisoners

constitutes the 'unnecessary and wanton infliction of pain proscribed by the Eighth

Amendment.'  Estelle, 429 U.S. at 103, 97 S Ct  At 290 (citing Gregg v  Georgia, 428

U S. 153, 173, 96 S Ct. 2909, 2925, 49 L Ed.2d 859 (1976))  This standard extends

to a prisoner's psychological needs as well as his physical needs  Partee v  Lane, 528

F  Supp  1254, 1260 (N.D. Ill. 1981)  However, the test is 'one of medical necessity'

and not simply what may be desirable  Id "  Ware v. Fairman, 884 F  Supp  1201,

1205-06 (N D  Ill. 1995).  The defendant, "must act with a sufficiently culpable state

of mind." <u>Hathaway v. Coughlin</u>, 37 F.3d 63, 66 (2d Cir. 1994), <u>cert. denied</u>, 513 U.S. 1154 (1995); <u>Leon v. Johnson</u>, 96 F. Supp. 2d 244, 248 (W.D.N.Y. 2000). "Deliberate indifference may only be found where there has been an unnecessary and wanton infliction of pain (citation omitted)." <u>Maldonado v. Terhune</u>, 28 F. Supp. 2d 284, 289 (D.N.J. 1998). "Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' <u>Rogers</u>, 792 F.2d at 1058) . . ." <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1505 (11th Cir. 1991). "Moreover, inadvertent failures to provide medical care, even if negligent, do not sink to the level of deliberate indifference." <u>Whitley v. Albers</u>, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986); <u>Layne v. Vinzant</u>, 657 F.2d 468, 471 (1st Cir.1981); <u>Ferranti v. Moran</u>, 618 F.2d 888, 890-91 (1st Cir.1980). In order to establish deliberate indifference, the complainant must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain. <u>See Wilson</u>, 111 S.Ct. at 2324-25; <u>Steading v. Thompson</u>, 941 F.2d 498, 500 (7th Cir.1991)." <u>DesRosiers v. Moran</u>, 949 F.2d 15, 19 (1st Cir. 1991).

It should further be noted that, "[e]xpert opinion is entitled to little weight in determining whether a punishment is cruel and unusual. <u>See Rhodes v. Chapman</u>, 452 U.S. at 348 n. 13, 101 S.Ct. At 2400 n. 13." <u>Toussaint v. McCarthy</u>, 801 F.2d

1080, 1113 (9th Cir. 1986)

Based upon the facts in this case, there is no indication that Defendants were deliberately indifferent to Plaintiffs' medical needs

## 2. Psychological.

Every claim by an inmate that he has not received adequate medical attention does not constitute a violation of the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 105, 97 S Ct. 285, 291, 50 L Ed 2d 251 (1976)   In order to file a proper claim, an inmate "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S at 105, 97 S Ct at 291,   Salazar v  City of Chicago, 940 F.2d 233, 239 (7th Cir.1991)   "Deliberate indifference" to the serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." Estelle, 429 U.S at 103, 97 S Ct at 290 (citing Gregg v. Georgia, 428 U S. 153, 173, 96 S.Ct. 2909, 2925, 49 L Ed.2d 859 (1976))   This standard extends to a prisoner's psychological needs as well as his physical needs. Partee v. Lane, 528 F.Supp  1254, 1260 (N.D.Ill 1981). However, the test is "one of medical necessity" and not simply what may be desirable.   Id.   "A pretrial detainee must be provided with medial treatment if a reasonable officer would have considered the injury serious." Murphy v. Walker, 51 F.3d 714 (7th Cir 1995) (per curiam ) (citing Davis v. Jones, 936 F 2d 971, 972 (7th Cir.1991)).   However, only intentional or reckless injury amounts to a violation of a pretrial detainee's rights.  Negligence is not sufficient.   Brownell v  Figel, 950 F 2d 1285, 1290 (7th Cir.1991) "Reckless conduct" includes "conduct that is so dangerous that the defendant's knowledge of risk can be inferred." Id

Ware v  Fairman, 884 F.Supp  1201, 1205-6 (N.D.Ill. 1995).

Generally, those courts which have dealt with claims of psychological deterioration

caused by confinement have rejected these claims  See Griffin v  Coughlin, 743 F

Supp  1006, 1017 (N.D N Y  1990)  "The right to treatment is, of course, limited to

that which may be provided upon a reasonable cost and time basis and the essential

test is one of medical necessity and not simply that which may be considered merely

desirable." Bowring v  Godwin, 551 F 2d 44, 48 (4th Cir  1977).

> For example, there is no right to preventive therapy where psychological

deterioration threatens   Jackson v. Meachum, 699 F 2d 578, 583 (1st Cir  1983)

Allegations of duress, psychological stress, and retrogression of human development

based on his assignment to administrative segregation was insufficient to even state

a claim under the Eighth Amendment  See, Everson v. Nelson, 941 F  Supp  1048,

1050 (D Kan. 1996).  Therefore, summary judgment was appropriate in the situation

of an inmate who committed suicide, even though he had been denied psychiatric (as

opposed to psychological) care and was not placed in a "suicide cell" where the

inmate had been accommodated both times he expressed a need for mental health

attention. Torraco v  Malony, 923 F 2d 231, 234-35 (1st cir. 1991)  Failure to always

provide interpreters for inmates during medical consultations does not create and

Eighth Amendment violation   See Franklin v. District of Columbia, 163 F 3d 625

(D.C. Cir. 1998).

### 3. Defendants are the Wrong Parties.

Plaintiffs have filed their claim for declaratory and injunctive relief against the Secretary of the Department and the wardens of nine institutions. It should be noted that supervisory officials must rely on their subordinate professionals to make competent medical and mental health decisions. So long as the supervisory officials concerned do not have reason to believe that their subordinates are failing to carry out their duties in a competent manner, they should not be held responsible for professional decisions over which they have no direct control. See Waldrup v Evans, 681 F Supp. 840,851 (M D Ga 1988), aff'd, 871 F.2d 1030 (11th Cir. 1989)  Here, with regard to medical and mental health decisions, Plaintiffs are unable to establish that those decisions are made by the defendants

### J.  The Changes Made Make the Entry of Injunctive Relief Moot.

The changes initiated by the rule changes of February 1, 2001, and the changes directed by the July 20, 2001 Memorandum (even if we ignore the Close Management Consolidation Plan, which we should not) set forth above render the Plaintiffs' demand for injunctive relief moot  A case is rendered moot when events make it impossible for the court to grant meaningful relief  In re Grand Jury Proceedings, 142

F.3d 1416, 1420-1421 (11th Cir 1998).[2] Here, there is no relief the court can give

the plaintiffs  As of February 1, 2001, as reflected by the Rule change, Defendants

completely revamped, restructured and altered their policies to correct any

deficiencies that may have existed in the past.  A federal court can require no more

than that  Ensley Branch NAACP v. Siebels, 31 F 3d 1548, 1574 (11th Cir 1994).

The district court has an obligation to consider these changed circumstances

prior to entry of injunctive orders. First, "[d]efects in subject matter jurisdiction

cannot be waived and may be raised at any time during the proceedings." Fox v

Board of Trustees of State University of New York, 42 F.3d 135, 139-140 (2d Cir.

1994) Thus, mootness can be raised at any time. Id. Second, the court cannot enter

injunctive relief on policies no longer in effect  Lawson v. Singletary, 85 F.3d 502,

507 n.5 (11th Cir. 1996), Webb v Missouri Pacific R. Co , 98 F.3d 1067, 1068-1069

(8th Cir 1996)(court cannot enter injunction based on evidence rendered stale by the

passage of time). Indeed, it is an abuse of discretion for the court to enter an

injunctive order on the basis of the old practices rather than the new policy. Lawson,

---

[2] "The exercise of federal jurisdiction depends upon the existence of a case or
controversy  A federal court has no authority to give opinions on moot questions or abstract
propositions, or to declare principles or rules of law which cannot affect the matter in issue in the
case before it " Church of Scientology v United States, 506 U S 9, 12 (1992)(citation and
internal quotation marks omitted)  If, during the pendency of an appeal, "an event occurs that
makes it impossible for this court to grant any effectual relief whatever to a prevailing party, the
appeal must be dismissed " Id at 12 (citation and internal quotation marks omitted)

85 F 3d at 507   If the court renders an injunction on a policy no longer in force, it engages in a mere academic exercise, which it cannot do.  <u>Jews for Jesus Inc  v. Hillsborough County Aviation Authority</u>, 162 F.3d 627, 629 (11th Cir. 1998)

Because of the changes implemented by Defendants, the court could not provide the plaintiffs with any meaningful relief – the core test of mootness. <u>Id.</u> <u>Atlanta Gas Light Co. v. FERC</u>, 140 F 3d 1392, 1402 (11th Cir. 1998). Because the order "would do no good," <u>Atlanta Gas</u> at 1402, the matter is moot and the court lacks jurisdiction to enter any injunctive order. <u>See Adler v  Duval County School Board</u>, 112 F 3d 1475, 1477 (11th Cir. 1997)(mootness doctrine's roots are in Article III's case or controversy requirement)

> Further, Such relief must be narrowly tailored:
> While one of the most important duties of federal courts is to protect the constitutional and statutory rights [of plaintiffs], interference in the processes of another branch of government should be as narrow and short-lived as fulfilling that constitutional duty allows

<u>Ensley Branch, NAACP v. Siebels</u>, 31 F.3d at 1574.  <u>See also</u> <u>Lewis v. Casey</u>, 518 U S. at 349, 391-2 (systemwide relief is never appropriate in the absence of a systemwide violation, and even then should be no broader and last no longer than necessary to remedy the discrete constitutional violation), <u>Spallone v. United States</u>, 493 U S  265, 275-6 (1990)(federal courts should use "least possible power" adequate to protect federal rights), <u>Missouri v. Jenkins</u>, 515 U S  70, 88 (1995)(remedial relief

25

must directly address and relate to the constitutional violation itself); Makin v City of Boston, 969 F 2d 1273, 1275-6 (1st Cir 1992)(intrusions by a federal court into the affairs of local government should be kept to bare minimum), cert denied, 506 U.S 1078 (1993)

If this court enters the relief sought, it will intrude deeply into State affairs. Simply ordering Defendants to carry out Plaintiffs' requested relief violates important principles of federalism and comity.

### K. The Eleventh Amendment Bars Declaratory Relief.

As Plaintiffs' claim for injunctive relief is now moot, Plaintiffs' remaining claim for declaratory relief is barred by the Eleventh Amendment. "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or protected against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The 11th Amendment also bars suits against a state by its own citizens. Pennhurst State School & Hospital v Halderman, 465 U S. 89, 100 (1984). It is well established that the Eleventh Amendment is an absolute bar to suit by an individual against a state such as Florida or its agencies in federal court absent a legitimate abrogation of immunity by

Congress or a waiver of immunity by the state being sued.[3] Gamble v Florida Department of Health & Rehabilitative Services, 779 F.2d 1509, 1511 (11th Cir. 1986)(citing Edelman v. Jordan, 415 U.S. 651 (1974)). This immunity applies regardless of whether the action is instituted against a state, a state agency or instrumentality, or a state official Edelman v Jordan, 415 U S. at 663.

The Eleventh Amendment reflects the "fundamental principle of sovereign immunity [that] limits the grant of judicial authority in Article III of the U S Constitution." Seminole Tribe of Florida v Florida, 517 U S 44, 65 (1996)(quoting Pennhurst, 465 U.S. at 97-8). It exists to prevent federal court judgments that must be paid out of a state's treasury, as well as to avoid the indignity of subjecting states to the coercive process of judicial tribunals at the instance of private parties. Seminole Tribe of Florida v. Florida, 517 U.S. at 58 (citations omitted).

Plaintiffs' claim for **prospective** injunctive relief to end what they claimed were **continuing** violations of federal law was not barred by the 11th Amendment in

---

[3]Plaintiffs do not assert an act of Congress as the basis for a claim that immunity has been abrogated by Congress Nor has Florida waived its immunity Indeed, Florida has availed itself to the fullest reach of the Eleventh Amendment *See* Fla Stat 768 28(17)("No provision of this section [waiving immunity for certain state law torts], or of any other section of the Florida Statutes, whether read separately or in conjunction with any other provision, shall be construed to waive the immunity of the state or any of its agencies from suit in federal court, as such immunity is guaranteed by the Eleventh Amendment to the Constitution of the United States, unless such waiver is explicitly and definitely stated to be a waiver of the immunity of the state and its agencies from suit in federal court "

accordance with the well-established doctrine of <u>Ex parte Young</u>, 209 U S  123 (1908)  However, in the absence of a continuing violation of federal law, there is no prospective relief to be had. The <u>Ex parte Young</u> doctrine cannot be used "to adjudicate the legality of past conduct " <u>Summit Medical Associates v. Pryor</u>, 180 F 3d 1326, 1337 (11th Cir. 1999).

The Supreme Court in <u>Green v. Mansour</u>, 474 U.S. 64, 73 (1985) held that a declaratory judgment related solely to past violations is the same as retrospective relief and is barred by the Eleventh Amendment.  The Court in <u>Green</u> reasoned that a declaratory judgment would be useful for plaintiffs resolving liability in state court proceedings by claiming <u>res judicata</u>. This would leave only the issue of damages. However, "issuance of a declaratory judgment in these circumstances would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment." <u>Id</u>. at 73.

Thus, Plaintiffs' claim for declaratory relief is barred.

## **SUMMARY**

Defendants' discretion to determine the specific conditions of segregation is similarly broad.  Given the "limitations of federalism and

the narrowness of the Eighth Amendment" it is not the Court's function
to pass judgment on the policy choices of prison officials. <u>Hoptowit</u>,
682 F 2d at 1246    Rather, prison administration is a matter "peculiarly
within the province of the legislative and executive branches of
government " <u>Turner v Safley</u>, 482 U S. 78, 84-85, 107 S.Ct 2254,
2259, 96 L Ed.2d 64 (1987). Defendants are thus entitled to design and
operate [the SHU] consistent with the penal philosophy of their
choosing, absent constitutional violations. <u>Peterkin v. Jeffes</u>, 855 F 2d
1021, 1033 (3rd Cir.1988). They may impose conditions that are "
'restrictive and even harsh' " <u>Farmer</u>, 511 U S. at ----, 114 S Ct  at 1977
(quoting <u>Rhodes</u>, 452 U.S  at 347, 101 S.Ct  at 2399);  they may
emphasize idleness, deterrence, and deprivation over rehabilitation
This is not a matter for judicial review or concern unless the evidence
demonstrates that conditions are so extreme as to violate basic concepts
of humanity and deprive inmates of a minimal level of life's basic
necessities   <u>Young</u>, 960 F 2d at 364 ("Segregated detention is not cruel
and unusual punishment per se, as long as the conditions of confinement
are not foul, inhuman or totally without penological justification");
<u>Toussaint III</u>, 597 F Supp. at 1413-14 (although doubting wisdom of
certain policies, the court observed that its function is "not to sit in
judgment of the policy choices of state officials").  In short, absent a
showing of constitutional infringement, courts may not substitute their
judgment or otherwise interfere with decisions made by prison officials
<u>Peterkin</u>, 855 F.2d at 1033, <u>Hoptowit</u>, 682 F.2d at 1246.

<u>Madrid v  Gomez</u>, 889 F Supp  1146, 1262 (N.D Cal. 1995).

The Defendants herein, based on the undisputed facts, could not be considered

deliberately indifferent to the basic needs or medical or psychological necessities.  If

any Eighth Amendment violations existed in the past, which is certainly not proven,

they have been eliminated by the changes which have taken place since February,

2001    No injunction is necessary, no declaratory relief is proper, and summary

judgment should be granted to the defense on all issues

Respectfully submitted,

ROBERT A BUTTERWORTH
ATTORNEY GENERAL

CHARLES M. FAHLBUSCH
Assistant Attorney General
Florida Bar No 0191948
Office of the Attorney General
110 S E 6th Street, 10th Floor
Ft Lauderdale, FL 33301
(954) 712-4600
Fax: (954) 712-4700

30

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by facsimile and email to PETER M SIEGEL, ESQ. and RANDALL C. BERG, ESQ , Florida Justice Institute, Inc. 2870 first Union Financial Center, 200 South Biscayne Blvd , Miami, FL 33131-2310, Fax No. (305) 358-0910 and to CHRISTOPHER JONES, ESQ., Florida Institutional Legal Services, Inc 1110-C N W 8th Avenue, Gainesville, FL 32601 Fax No (352) 271-4366 on this 10th day of September, 2001

CHARLES M. FAHLBUSCH
Assistant Attorney General

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO  97-2806-CIV-HUCK
MAGISTRATE JUDGE SORRENTINO

MARK OSTERBACK, et al.,            )
                                   )
     Plaintiffs,                   )
                                   )
v.                                 )
                                   )
MICHAEL W. MOORE, et al.,          )
                                   )
     Defendants.                   )
_____  )

## PLAINTIFFS' RESPONSE TO INTERROGATORY

PLEASE TAKE NOTICE that plaintiff, MARK OSTERBACK, responds
to the Interrogatory and states

This lawsuit involves the allegation that the policy,
pattern, practice and custom of the defendants in the operation
of the close management system of the Florida Department of
Corrections, as alleged in the Second Amended Complaint, violates
the Cruel and Unusual Punishments Clause of the Eighth Amendment
The Complaint does not allege that any specific Rule of the
Department of Corrections, or any particular portion of any Rule
of the Department of Corrections, is unconstitutional, either on
its face or as applied   The reason the Complaint does not so
allege is that the close management system is more than just a
rule   Rather, plaintiffs' allege that the close management
system, which includes far more than just a written rule, results
in Cruel and Unusual Punishment, contrary to the Eighth
Amendment   Because of plaintiffs' contentions about close



management, they have no position as to whether any or all of the published Rules governing close management are unconstitutional on their face or as applied.  In sum, the entire system, of which the applicable rules are but a part, results in the imposition of cruel and unusual punishment

Respectfully submitted,

Peter M  Siegel, Esq
Randall C  Berg, Jr , Esq

Florida Justice Institute, Inc.
2870 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2310
305-358-2081
305-358-0910 (FAX)
pmsigel@bellsouth net

and

Christopher Jones, Esq
Florida Institutional Legal
  Services, Inc.
1110-B N W  8th Avenue
Gainesville, Florida 32601
352-375-2494
352-271-4366 (FAX)
chris-jones@excite com

Attorneys for Plaintiffs

By    Peter M. Siegel, Esq
      Florida Bar No  227862

in the chain of command in the absence of the warden, on an individual basis based upon the criteria set forth in rule 33-601 707   Such visits may be for any purpose, including

(a)     Visits by persons who do not plan to visit often enough to warrant inclusion in the inmate's visitors list, and

(b)     Visits outside normal visiting days or regular visiting hours, or during the normal work week which will be approved only in exceptional circumstances

(2)     Decisions    regarding    the approval of special visits may be guided by the number of visits the inmate receives

(3)     Special  visits  should  be requested 10 days in advance and approved 24 hours  in  advance  except  when  special circumstances make such advance approval impractical

Specific Authority 20 315, 944 09, FS   Law Implemented 944 09 FS   History--New 10-6-83, Formerly 33-5 10, Amended 6-20-85, 3-12-86, 3-8-98, Formerly 33-5 010

### 33-601 711     Legal Visitors

(1)     An  attorney  may  visit  an inmate whom he  represents  if  the  inmate wishes to confer with the attorney and the attorney presents sufficient identification and evidence of his status as an attorney

(2)     A law student, law clerk or legal  paraprofessional  working  under  the supervision  of  an  attorney  may  visit  an inmate whom the attorney represents, subject to all conditions applicable to the attorney, if the attorney provides a signed statement agreeing to supervise the assistant and to accept    personal    and    professional responsibility for all acts of the assistant that may affect the institution, its inmates and staff

(3)     If more requests for visits by attorneys and assistants are received than can be accommodated, attorney visits shall be given priority over visits by assistants

(4)     Legal  visits  should  be scheduled between 8 00 a m  and 5 00 p m , Monday through Friday excluding holidays   A legal visit may be scheduled at other times if, in the opinion of the warden or his designee, such scheduling is necessary to avoid legal disadvantage to the inmate or undue hardship to the attorney

(5)     The Warden shall provide an adequate  area  for  attorneys  and  their representatives to visit their inmate clients

in order to insure the privacy of such visits

Specific Authority 20 315, 944 09 FS   Law Implemented 944 09, 944 23 FS   History--New 10-6-83, Formerly 33-5 11, Amended 3-8-98, Formerly 33-5 011

### 33-601 712     Use of Cameras and Tape Recorders by Attorneys

(1)     An attorney may bring and use a camera to photograph his inmate client if he certifies in writing that the physical condition of the inmate client is relevant to a pending or prospective lawsuit, that he needs to photograph the inmate client to preserve evidence of such condition, and that he will comply with reasonable security procedures   No inmate shall be photographed without his consent   Photographs that might jeopardize security by showing the physical layout of the institution or in any other specific way shall not be permitted

(2)     When an attorney visits an inmate he may bring and use a tape recorder or video camera to record the conversation provided he agrees to comply with reasonable security  procedures,  to  tape  only  his conversations with the inmate, and provided the inmate consents

(3)     The  warden  or  his  designee shall  impose  such  requirements  regarding inspections of cameras and tape records and the time, place and manner of their use as may be necessary to preserve institutional security

Specific Authority 20 315, 944 09, 944 23 FS   Law Implemented 944 09, 944 23 FS   History--New 1-12-83, Formerly 33-5 091, Amended 3-8-98, 3-23-99, Formerly 33-5 0091

### 33-601 801     Close Management   -   General

Close management is the confinement of an inmate apart from the general population, for reasons of security, or the order and effective management of the institution, where the inmate, through his own behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others   The goal of close management shall be toward assignment of the inmate to the least restrictive level to meet the management needs of the inmate and returning the inmate to open population as soon as the facts of the case suggest it is in the best interest of the security and order of


DEFENDANT'S EXHIBIT
2

EC1-58

the institution and public safety   To aid in this transition back into open population, the close management review team is authorized to place Close Management III inmates in work assignments outside the close management unit and in assignments usually assigned to open population inmates   The secretary shall designate which institutions are authorized to house close management inmates, based on the needs of the department

Specific Authority  944 09 FS  Law Implemented  944 09 FS   History -- Transferred from 33-3 0083, 10-01-95, Amended 4-14-98, Formerly 33-38 001

### 33-601 802      Levels   of   Close Management

Close management consists of three levels of housing restriction

(1)    Close management I is the most restrictive single cell housing level of all the close management status designations   Inmates shall not remain in close management I for more than 37 months, unless the inmate demonstrates a continued failure to comply with statutes, rules of the department, or oral or written instructions given to him by department staff while assigned to close management level I   An inmate may be placed in Close management I without having previously been in Close management II or III   The following factors shall constitute a basis for placement of an inmate in Close management I

(a)    Incident causing death

(b)    An act causing injury or an act which could have resulted in injury to another

(c)    The taking of a hostage or an attempt to take a hostage

(d)    Instigation or incitement of a riot or disorder

(e)    Creating or causing property damage in excess of $1,000

(f)    Participation in or causing further institutional disruption during a riot or disorder

(g)    An escape or escape attempt involving use of a weapon, outside assistance, use of equipment or tools to penetrate a secure perimeter or violence committed during or while on escape

(h)    An escape or escape attempt from a secure perimeter

(i)    An escape or escape attempt while under armed supervision while outside

the perimeter of the institution

(j)    Possession    of    weapons ammunition, explosives, flammables, or initiation of or participation in trafficking of these items or trafficking in drugs

(k)    Participation in a sexual assault or battery

(l)    Inmate meets the criteria for placement in close management level II or III and the inmate has been in close management previously during the current period of incarceration

(m)    Any inmate currently in CM II or CM III status who shows an inability to adjust as evidenced by continued disciplinary actions or unsatisfactory ratings

(n)    Documented leadership in a security threat group which is certified by the central office's threat assessment review committee

(2)    Close    management    II    is restrictive cell housing not exceeding 25 months in duration unless the inmate demonstrates continued failure to comply with statutes, rules of the department, or oral or written instructions given to him by department staff while assigned to close management level II   An inmate is not eligible for a work assignment in close management II until satisfactorily completing a 90 day period of at least satisfactory adjustment (as defined in rule 33-603 401) following the first month of assignment to close management and maintaining a clear disciplinary record   If found guilty of any disciplinary infraction while assigned to close management II, the inmate must have at least another 90 disciplinary free days to be reconsidered for a work assignment   Inmates in close management II status are only eligible for work assignments in close management I, close management II, or death row housing units   Inmates may be placed into close management II without having previously been placed in close Management III   The following factors shall constitute a basis for placement of an inmate in close Management II

(a)    An act or acts in the community,    during    other    periods    of confinement, or any circumstances associated with the current period of incarceration such that safety, security, and public safety concerns suggest further review prior to placement in open population

(b)    A pattern of predatory actions which makes the inmate a threat to others

(c)     An act causing injury or an act which could have resulted in injury to another

(d)     Escape or an escape attempt from within the secure perimeter of a facility without violence, the use of weapons, the taking of hostages, the use of equipment or tools, or outside assistance

(e)     Participation in riots or disorders during any period of incarceration

(f)     A pattern of behavior during the present period of incarceration involving acts of violence or threats of violence

(g)     Initiated, or participated in a contraband trafficking operation involving negotiables, escape paraphernalia (other than items listed in 33-601 802(1) (j)), or other items that present a threat to the safe and secure operation of the institution or facility

(h)     Presents a risk to other inmate's safety and well being in population, as identified by an act or acts which demonstrates an inability to live in general population without endangering others

(1)     Met the criteria for placement in close management level III and the inmate has been in close management previously during the current period of incarceration

(j)     Any inmate currently in CM III status who shows an inability to adjust as evidenced by continued disciplinary action or unsatisfactory ratings

(3)     Close management III is restrictive cell housing not exceeding 13 months in duration unless the inmate is housed at Florida State Prison and is considered to be a continued threat to security and safety of the facility, in this situation, close management III housing is not limited to 13 months   Continuation of close management III status over 13 months at FSP requires the approval of the regional director every six months   An inmate is not eligible for a work assignment inside or outside the close management unit until after completing 60 days after the first month in close management status with a clear disciplinary record and satisfactory adjustment (as defined in rule 33-603 401) since being assigned to close management   After this observation period an inmate is eligible for consideration for an institutional work assignment   The decisions to make work assignments and what type of assignments are to be made shall be based upon the inmate's behavior and the need to provide

a transition back into open population status
The close management review team is authorized to place CMIII inmates in work assignments within or outside the close management unit, to assign inmates to work with other close management inmates, and to place inmates in assignments usually designated for open population inmates   If found guilty of any disciplinary infraction while assigned to close management III, the inmate must have at least another 60 discipline free days in order to be considered for return to a work assignment   Inmates may be placed into close management III status as a result of or a history of the behaviors identified below

(a)     An escape or an escape attempt, or a documented history of escape from a non-secure facility or environment without violence, weapons, outside assistance, or the arrest for any other felony while on escape

(b)     Assisting or aiding in an escape or an escape attempt

(c)     A history of disciplinary action or institutional adjustment reflecting an inability to live in the general inmate population without disrupting the operation of the institution

(d)     Participation in a predatory or aggressive act through the use of force or intimidation

(e)     Participant in a riot or disorder by refusing to follow orders of staff

(f)     Possession of unauthorized drugs, testing positive for drugs on a urinalysis test, possession of negotiables, escape paraphernalia (except items listed in rule 33-601 802(1) (j)), or other items that present a threat to the safe and secure operation of the institution or facility

(g)     Validated membership in a security threat group which has been certified by the central office threat assessment review committee

Specific Authority 944 09 FS   Law Implemented 944 09 FS   History -- Transferred from 33-3 0083, 10-01-95, Amended 4-14-98, Formerly 33-38 002

**33-601 803     Privileges in Close Management**

The inmate's movements within the institution and contacts with other persons shall be restricted and privileges for

specific management levels shall be limited

(1)     Privileges     for     inmates assigned to close management level I who maintain a satisfactory adjustment (as defined in rule 33-603 401)

(a)     Participation     in     available approved programs that the inmate can perform within the cell after a minimum period of at least six months with a clear disciplinary record since assignment to close management

(b)     Check out 1 soft back book from library at least once per week, possess no more than four personal soft back books

(c)     Conduct     routine     inmate     bank transactions once per month   This shall not in any way restrict the inmate's preparation and mailing of legal documents necessary for access to the courts

(d)     Make canteen purchases once per month, unless restricted by disciplinary team action   Canteen purchases are limited to health and comfort items and writing supplies, including stamps, unless modified by rule 33-601 811(1) and (2)

(e)     Subscribe to one magazine as provided for in rule 33-501 401, admissible reading material   Possess no more than four magazines

(f)     Subscribe to one newspaper as provided for in rule 33-501 401, admissible reading material   Possess no more than four issues

(g)     Make emergency telephone calls and telephone calls to an attorney as provided for in rule 33-602 205, Inmate Telephone Use

(h)     Receive a personal visit after completing 90 days following the first month in the status and having maintained a clear disciplinary record since assignment to close management     If     found     guilty     of     any disciplinary infractions while assigned to close management I, he is eligible to be considered for visits 90 days following the disciplinary action with a continued clear disciplinary record   An inmate is eligible to receive personal visits after each subsequent 90 day period with a continued clear disciplinary record while in this status unless security or safety concerns would preclude a visit   All visits for inmates in close management I shall be non-contact visits

(2)     In addition to the privileges provided for level I, Inmates assigned to close management level II who maintain a satisfactory adjustment (as defined in rule

33-603 401) are also eligible to receive a personal visit after completing 60 days following the first month in close management status     and     having     maintained     a     clear disciplinary record since being assigned to close management     If found guilty of any disciplinary infraction while assigned to close management II, he is eligible to be considered for visits 60 days following the disciplinary action with a continued clear disciplinary record   An inmate is eligible to receive personal visits after each subsequent 60 day period with a continued clear disciplinary record while in the status unless security and safety concerns would preclude a visit     All visits for inmates in close management II shall be non-contact visits

(3)     Privileges     for     inmates assigned to close management level III in addition to the privileges provided for in levels I or II are

(a)     Receive a personal visit after completing 60 days satisfactory adjustment (as defined in rule 33-603 401) in a close management status following the first month and having maintained a clear disciplinary record and satisfactory adjustment (as defined in rule 33-603 401) since being assigned to close management     If found guilty of a disciplinary infraction while assigned to close management III, the inmate must have at least another 30 discipline free days to be reconsidered for visits     An inmate is eligible to receive personal visits after each subsequent 30 day period with a continued clear disciplinary record and satisfactory adjustment (as defined in rule 33-603 401) while in the status unless security or safety concern would preclude a visit   The level of supervision and restraint of close management III inmates during visits shall be determined by the warden

(b)     Day room privileges after six continuous months with a clear disciplinary record and above satisfactory adjustment (as defined in rule 33-603 401) within the management unit unless security and safety concerns would preclude dayroom activities   This privilege shall be limited to once a week for up to two hours in duration

Specific Authority 944 09 FS   Law Implemented 944 09 FS   History -- Transferred from 33-3 0083, 10-01-95, Amended 4-14-98, 9-2-98, Formerl 33-38 003


33-601 804     Close Management Review

**Team**

The close management review team is responsible for acting on all recommendations for assignment to close management and for reviews prepared for inmates in close management

(1)    The close management review team, as a minimum, shall consist of three members from the following staff positions

(a)    Assistant warden

(b)    Correctional officer chief or designee (designee must be at least the rank of lieutenant),

(c)    Correctional         probation supervisor or correctional probation senior officer

(d)    Others as appointed by the warden

(2)    The correctional probation officer assigned to close management shall provide input to the team

Specific Authority 944 09 FS   Law Implemented 944 09 FS   History -- Transferred from 33-3 0083, 10-01-95, Formerly 33-38 004

### 33-601 805        Assignment    to    Close Management

(1)    The close management review shall be documented on a report of close management, form DC4-813(c)   The inmate shall be given a minimum of 24 hours to prepare for the review and may present information verbally or in writing for consideration by the close management review team   The close management review team is authorized to postpone the case review to allow the inmate additional time to prepare   A staff assistant shall be assigned when the team determines the inmate is illiterate or does not understand English, or when the complexity of the issue makes it unlikely that the inmate will be able to properly represent himself or herself or when the inmate indicates that he or she needs or desires staff assistance   It is the responsibility of the staff assistant to explain the close management recommendations and procedures to the inmate   The designated staff assistant shall be authorized to

(a)    Assist the inmate during the hearing,

(b)    Be present in the hearing room when the inmate is in the hearing, and

(c)    Aid the inmate in presenting his or her position

(d)    The staff assistant shall not take the position of an advocate or defense

attorney

(2)    The close management review team shall inform the inmate of the basis for its decision and provide a copy of the team's decision to the inmate at the conclusion of the review

(3)    If the inmate demonstrates behavior, either before or during the review, that impedes the process, the behavior shall be documented in the team recommendation and the review completed without the inmate present

(4)    After the review has been completed the recommendation of the close management review team shall be forwarded to the warden for a final decision pursuant to 33-601 807

Specific Authority 944 09 FS   Law Implemented 944 09 FS   History -- Transferred from 33-3 0083, 10-01-95, Formerly 33-38 005

### 33-601 806        Review of Assignment to Close Management

The close management review team shall convene as often as necessary to ensure each inmate is reviewed at least once every six months to determine if continuation, modification, or removal from close management status is appropriate

(1)    The report of close management will be completed by the correctional probation officer assigned to close management and will serve as a scheduled progress report for the inmate   The following elements shall be considered

(a)    Disciplinary history within the review period

(b)    Adjustment         within    the management unit

(c)    Behavior when outside the management unit

(d)    Evaluation of the inmate's conduct while on any assignment

(e)    Continued need for the supervision provided by the level of close management assigned

(2)    The review by the close management review team shall include the following

(a)    The correctional probation officer review as documented on form DC4-813c, report of close management

(b)    Completion of an updated custody score sheet

(c)    Review of the daily record of confinement (DC4-815)

(d)    Review of the reasons for placement into close management

(e)    Interview of the inmate by the close management review team pursuant to 33-601 805'3)

(f)    Review of the inmate file or any other information essential to complete the review

(3)    The action of the team shall be documented on the report of close management form DC4-813(c)   Each team member shall sign the report with the name typed or printed under the signature

(4)    The close management review team shall schedule inmates who remain assigned to close management for the maximum amount of time allowable in the status for review at least one month prior to the completion of the maximum time period

(a)    Retention in close management level I beyond 37 months is dependant on the inmate's demonstrated compliance or failure to comply with statutes or the rules and policies of the department   Team action recommending an extension of assignment to level I shall be forwarded to the warden for action

(b)    An inmate assigned to level I for continuance beyond 37 months will be reviewed each six months thereafter by the special review team   For each six month report following the date of initial continuance, subsequent team recommendations for continuance in level I shall be reviewed by the warden and regional director

(c)    Inmates assigned to close management level II or III shall not be retained in their assigned status level beyond the maximum period allowed for the level

1    An inmate in level II that remains in the assignment for the maximum period allowed shall be

a    Removed from close management and assigned to another status

b    Reassigned to close management level I if the inmate demonstrates a pattern of failure to comply with statutes and the rules and policies of the department while assigned to level II   Additional continuance in close management requires action by the warden and regional director at six month intervals from the date of the continuance

c    Reassigned to close management level III if the inmate has demonstrated the ability to comply with statutes and the rules and policies of the department while assigned to level II but is determined to need an

additional period of observation prior to reassignment from close management status   This requires action by the warden and regional director at six month intervals from the date of the continuance

2    An inmate in level III that remains in the assignment for the maximum period allowed shall be reassigned from level III to another status except as outlined in 33-601 802(3)   The initial recommendation for continuance in close management and all subsequent continuances in close management status requires action by the warden and regional director at six month intervals from the date of the continuance

(5)    If an inmate assigned to close management level II or III is identified as a participant in an incident meeting the criteria for placement in a higher level of close management, the inmate shall be reprocessed in accordance with rule 33-601 805

(6)    Unless removed from close management status by the close management review team or reviewing authorities, time spent by the inmate in a status other than close management will not count towards completion of the time the inmate can be assigned to close management status   Examples include the following   time spent in disciplinary confinement, time spent out of the department's custody   and time spent as an inpatient for medical or mental health reasons   This provision shall not be applied to status changes that occurred prior to the implementation of this rule

(7)    If an inmate in close management is reassigned to another level of close management requiring the inmate to be transferred to facilitate the new level of close management, time spent awaiting transfer shall be taken into consideration when setting the schedule of reviews by the close management review team of the receiving institution   If it becomes necessary to transfer an inmate in close management status to another facility, the sending institution will determine the appropriate level of close management based upon the criteria and facts for placement prior to the transfer   If the documentation accompanies the inmate, the receiving institution can then place the inmate directly into that close management status without completing an additional evaluation   however, the receiving institution also has the authority to review and recommend

a change of status so long as it is not a higher close management status until continued behavior dictates an increase in the level of close management

Specific Authority 944 09 FS   Law Implemented 944 09 FS   History -- Transferred from 33-3 0083, 10-01-95, Amended 4-14-98, Formerly 33-38 006

### 33-601 807   Close Management - Warden's Responsibility

(1)   The warden shall review and take action on all recommendations of the close management review team based on review of the completed report and to ensure the decision of the close management team is consistent with the facts and the requirements of this chapter

(2)   The warden's review authority shall be as follows

(a)   Approve, disapprove, or modify the close management team recommendation Approvals exceeding the time maximums shall be forwarded to the regional director or director of security and institutional management if designated by the regional director for final action

(b)   Obtain further information from the close management review team before reaching a final decision

Specific Authority 944 09 FS   Law Implemented 944 09 FS   History -- Transferred from 33-3 0083, 10-01-95, Amended 4-14-98, Formerly 33-38 007

### 33-601 808   Close Management - Regional Director's Responsibility

(1)   The regional director or director of security and institutional management if designated by the regional director shall review and take action on all close management review team recommendations forwarded by the warden to ensure the decision is consistent with the facts and requirements of this chapter

(2)   The regional director's or designee's review authority shall be as follows

(a)   Approve, disapprove, or modify the team recommendation approved by the warden

(b)   Obtain further information from the warden before reaching a final decision

Specific Authority 944 09 FS   Law Implemented 944 09 FS   History -- Transferred from 33-

3 0083, 10-01-95, Amended 4-14-98, Formerly 33-38 008

### 33-601 809   Close Management - Case Management Responsibilities

(1)   Inmates in close management shall be reviewed by the assigned correctional probation officer every week and the review shall be documented on the daily record of confinement, form DC4-815

(2)   Any inmate assigned to close management for more than 30 continuous days shall be given a psychological assessment by professional medical staff to determine his mental condition   For inmates who remain in confinement beyond 90 continuous days, a psychological assessment shall be completed each 90 day period   The assessment shall include a personal interview   All psychological assessments will be documented in the inmate's mental health file   Only those cases recommended for a change in status need to have a report prepared for the warden   The warden shall then make a final decision regarding continuation of confinement based on the facts and recommendations in the report

(3)   A written evaluation report by the inmate's classification team is required on inmates in close management each six months for review by the close management review team on form DC4-813(c)

(4)   Inmates in close management shall receive a personal contact a minimum of

(a)   At least every hour by a correctional officer

(b)   Daily by the housing unit supervisor on duty for the day and evening shift, except in the case of an institutional emergency

(c)   Daily by a representative of the medical department

(d)   As frequently as necessary, but not less than weekly, by the inmate's assigned correctional probation officer to ensure that the inmate's welfare is properly provided for, and to determine the need for any program change recommendations

(e)   The officer in charge on duty for the day or evening shift shall visit the housing unit to observe the operation and make any adjustments appropriate

(g)   Weekly by the chaplain if possible   More frequent visits should be made upon request of the inmate, if the chaplain's schedule permits

(5)   For the purposes of this rule,

"special management inmate" means any inmate who has demonstrated behavior that could place himself, other inmates, or staff in a situation where grievous harm may be inflicted or who has become an extreme security risk  An inmate who, in the opinion of the senior correctional officer on duty, has become a special management inmate while in close management shall whenever possible be placed in a location, either in confinement or another designated area, where more frequent observation can be given and checks made by the correctional officer or medical staff at least every 30 minutes until the inmate is no longer considered a special management inmate
Specific Authority 944 09 FS   Law Implemented 944 09 FS    History -- Transferred from 33-3 0083, 10-01-95, Amended 4-14-98, Formerly 33-38 009

### 33-601 810   Close   Management Facilities

(1)     The number of inmates housed in a close management cell shall not exceed the number of beds in the cell except during an emergency situation  Such exceptions shall not continue for more than 24 hours without the specific authorization of the regional director

(2)     All close management cells will be equipped with toilet facilities and running water for drinking and other sanitary purposes

(3)     Prior to placement of an individual in a close management cell, it shall be thoroughly inspected to ensure that it is in proper order and the inmate housed in that cell shall then be held responsible for the condition of the cell

(4)     The close management cells shall be physically separate from administrative and disciplinary confinement cells, whenever possible  Whenever physical separation is not possible, close management status inmates shall be separated by status from non-close management inmates who are confined for disciplinary or administrative reasons  Close management inmates can serve disciplinary confinement in their close management cells
Specific Authority 944 09 FS   Law Implemented 944 09 FS    History -- Transferred from 33-3 0083, 10-01-95, Amended 4-14-98, Formerly 33-38 010

### 33-601 811   Close   Management   -

#### Other Conditions and Privileges

(1)     Comfort Items - Inmates in close management shall be permitted personal hygiene items and other medically needed or prescribed items such as eye glasses, hearing aids, etc , except when security requirements dictate otherwise  In the event certain items are removed from inmates in close management, the supervising correctional officer on duty shall be notified and must approve the action taken, or the item must be returned to the inmate  Action taken will be recorded on the daily record of confinement, form DC4-815, which must be reviewed and approved by the correctional officer chief  Property receipts will be given for any personal property removed  The following comfort items will be provided as a minimum     toothbrush, toothpaste, bar of soap, towel (or paper towels), sanitary napkins (female), and toilet tissue

(2)     Inmates shall be allowed to retain personal property including watches, rings and health and comfort items unless there is an indication of a security problem, in which case removal of any item will be documented on form DC4-815 and a property receipt issued  The warden shall determine, based on institutional considerations, whether additional property is to be allowed  Radios, tape players, record players, television sets, and other electronic entertainment devices are not authorized for inmates in close management

(3)     Personal Hygiene - Inmates in close management shall meet the same standards in regard to personal hygiene as required of the general inmate population

(a)     As a minimum each inmate in close management will shower three times per week

(b)     Male inmates shall be required to shave at least three times per week if necessary to maintain a clean shaven appearance  Hair care shall be the same as that provided to and required of the general inmate population

(c)     Bedding and linen will be issued and exchanged for close management inmates the same as for the general population

(4)     Correspondence - Inmates in close management shall have the same opportunities for correspondence that are available to the general inmate population

(5)     Legal Access - Legal materials

shall be as accessible to inmates in close management as for inmates in general population as long as security concerns permit An inmate in close management shall be required to conduct legal business by correspondence rather than a personal visit to the law library if security requirements prevent a personal visit However, all steps shall be taken to ensure the inmate is not denied needed access while in close management Indigent inmates will be provided paper and writing utensils in order to prepare legal papers Typewriters or typing services are not considered required items and will not be permitted in close management cells

(6) Diet - All inmates in close management shall receive institutional meals as are available to the general inmate population except that if any item or the menu might create a security problem in the close management area, then another item of comparable quality may be substituted Other substitutions shall be documented on the daily record of confinement, form DC4-815

(7) Counseling Interviews - Inmates in close management may be removed from their cells to attend any counseling session when there is no security problem involved in such removal

(8) Clothing - Belts may be removed Shower slides or slip-on canvas shoes for cell use may be substituted for regulation shoes Otherwise the clothing for inmates in close management shall be comparable to that available to the general inmate population except when security concerns dictate otherwise In such cases, when clothing is denied to an inmate it shall be noted on form DC4-815, stating the reasons for such denial

(9) Exercise - Those inmates confined on a 24 hour basis, excluding showers and clinic trips, may exercise in their cells However, if confinement extends beyond a 30 day period, there shall be an exercise schedule providing a minimum of 2 hours per week of exercise outside of the cell Such exercise periods shall be documented in the confinement records Exceptions to this requirement may be made only when safety and security concerns can document such exercise periods should not be granted and the withholding of e ercise is approved by the close management review team Medical restrictions may also place limitations on the e ercise periods Wellness programs may be

available for the exercise period provided such activity does not interfere with the safety of staff and inmates or security of the institution

(10) Legal visits shall be allowed as provided in Rule 33-601 711, Legal Visitors
Specific Authority 944 09 FS Law Implemented 944 09 FS History -- Transferred from 33-3 0083, 10-01-95, Formerly 33-38 011

## 33-601 812 Close Management Records and Forms

(1) A report of close management, form DC4-813(c), shall be kept for each inmate placed in close management

(2) An inspection of confinement record, form DC4-814, shall be maintained in each close management area Such record shall be signed by the staff person when entering and leaving the close management area Prior to leaving the close management area, the staff member will indicate any specific problems including any inmate who required special attention

(3) A daily record of confinement, form DC4-815, shall be maintained for each inmate as long as he is in close management If items are denied or removed from the inmate, the senior correctional officer on duty must approve the action The items denied or removed shall be noted on the Form DC4-815 and the chief correctional officer shall make the final decision in regard to the appropriateness of that action The supervising officer shall make a rotation of any unusual occurrences or changes in the inmate's behavior and any action taken Changes in housing location or any other special action shall also be noted

(4) Form DC4-813(c), Report of Close Management, is hereby incorporated by reference A copy of this form is available from the Adult Services Program Office, Department of Corrections 2601 Blair Stone Road, Tallahassee, Florida, 32399-2500 If the form is to be mailed, the request must be accompanied by a self-addressed stamped envelope The effective date of this form is October 1, 1995
Specific Authority 944 09 FS Law Implemented 944 09 FS History -- Transferred from 33-3 0083, 10-01-95, Amended 4-14-98 Formerly 33-38 012

## 33-601 813 Close Management - Rule

**Change Implementation**

(1) Institutions currently authorized for close management shall have 180 calendar days, from the effective date of this rule to review their current close management population and bring their assignments into compliance with this rule   The review shall involve all inmates assigned to close management status on the effective date of this chapter   Until the review is completed for an individual inmate, that inmate shall be treated in accordance with the provisions of this chapter for that particular status   For these inmates already assigned to close management status on the effective date of this chapter, time previously spent in close management shall be applied when considering the inmate for eligibility for privileges pursuant to rule 33-601 803

(2) On and after the effective date of this rule, inmates being considered for assignment to close management shall be reviewed in accord with the requirements of this chapter

Specific Authority 944 09 FS   Law Implemented 944 09 FS History -- New 10-01-95, Formerly 33-38 013

**33-601 901   Confidential Records**

(1) No inmate or offender under jurisdiction of the department shall have unlimited or routine access to any information contained in the records of the department   Section 945 10(3), FS, authorizes the Department of Corrections to permit limited access to information if the inmate or offender makes a written request and demonstrates an exceptional need for information contained in the department's records and the information is otherwise unavailable   Such information shall be provided by the department when the inmate or offender has met the above requirements and can demonstrate that the request is being made under exceptional circumstances as set forth in s 945 10(3), FS   It shall be the responsibility of the inmate or offender to maintain such information, and repeated requests for the same information shall not be honored

(2) Copies of documents which have been previously provided to the inmate or offender under other rules of the department will not be provided unless the inmate or offender can demonstrate that exceptional circumstances exist

(3) No inmate or offender shall have access to any other inmate's or offender's file

(4) An inmate desiring access to information shall submit the written request to his or her classification specialist or officer-in-charge of a community facility, a supervised offender shall submit the request to his or her supervising officer   If the request does not meet the requirements specified in s 945 10(3) FS, the request shall be denied in writing   If the request meets the requirements specified in s 945 10(3), the request shall be approved without further review   If the request meets the requirements specified in s 945 10(3) FS, but details exceptional circumstances other than those listed, the classification specialist or officer-in-charge shall review the request and make a recommendation to the classification supervisor or warden of community facilities who shall be the final authority for approval or disapproval of requests from inmates, for supervised offenders, the recommendation shall be submitted to the correctional probation circuit administrator or designee who shall be the final authority for approval or disapproval

(5) If the information being requested requires duplication, the cost of duplication shall be paid by the inmate or offender, and the inmate or offender will sign a receipt for such copies   The cost for copying is $0 15 per page for single-sided copies   Only one sided copies will be made for inmates, two-sided copies will not be made for inmates   Additionally, a special service charge will be assessed for providing information when the nature or volume of the records requested requires extensive clerical or supervisory assistance by department personnel   "Extensive" means that it will take more than 15 minutes to locate, review for confidential information, copy and refile the requested material   The special service charge will be computed to the nearest quarter of an hour exceeding 15 minutes based on the current rate of pay for the paygrade of the person who performed the service, but not to exceed paygrade 18   Exceptions will not be made for indigent inmates or offenders   indigent inmates will be required to pay for copies

(6) The following records or information contained in department files

shall be confidential and shall be released for inspection only as authorized in this rule

(a)    Medical    reports,    opinions, memoranda, charts or any other medical record of an offender, including dental and medical classification reports as well as clinical drug treatment and assessment records, letters,    memoranda    or    other    documents containing    opinions    or    reports    on    the description,    treatment,    diagnosis    or prognosis of the medical or mental condition of an offender, the psychological screening reports contained in the admission summary, the psychological and psychiatric evaluations and reports on offenders, health screening reports, Mentally Disordered Se Offender Status Reports    Other persons may review medical records only upon when necessary to ensure that the offender's overall health care needs are met, or a specific written authorization from the offender whose records are to be reviewed, or as provided by law    If a request for inmate medical records is submitted upon consent given by the patient inmate/offender, the department's Consent for Inspection And/Or Release of Confidential Information, Form DC4-711B must be utilized in order to obtain inmate medical records held by the department    Form DC4-711B is hereby incorporated by reference  Copies of this form are available at any institution or the Office of Health Services, 2601 Blair Stone Poad, Tallahassee, Florida, 32399-2500  The effective date of this form is June 12, 1996    Offenders under supervision, or previously under supervision, who desire information from their own records, shall be referred to the agency or office originating the report or document to obtain such information    Inmates desiring access to information in their own medical records shall submit a written request to the health information specialist/supervisor    If the request does not meet the requirements specified in subsection (1), the request shall be denied    If the request meets the requirements specified in subsection (1) and falls within exceptions (a) through (e) of s 945 10(3), FS, the request shall be approved without further review    The records will be provided upon receipt of payment    If the request meets the requirements specified in s  945 10(3), but  details  e ceptional circumstances other than those listed in (a) through (e) or falls within (f), the health

information    specialist/supervisor    shall review the request and make a recommendation to the chief health officer who shall be the final authority for approval or disapproval

(b)    Preplea,    pretrial intervention, presentence and post-sentence investigation reports including supplements, addenda and updates

(c)    Information regarding a person in the federal witness protection program

(d)    Parole    Commission    records which are confidential or exempt from public disclosure by law

(e)    Information which if released would jeopardize a person's safety

(f)    Information pertaining to a victim's    statement    or    which    reveals    a victim's identity, address or phone number

(g)    The    identity    of    an executioner

(h)    Pecords    that    are    otherwise confidential or exempt from public disclosure by law    This confidentiality is not intended to prevent the use of the file material in management information systems or to limit the dissemination of information within the department to health services staff having a need to know or to other criminal justice system agencies approved by the department

(7)    Blueprints, detailed physical diagrams, photographs of institutions and facilities and computer printouts containing information    on    offenders    except    those printouts specifically designated for public use are confidential and can be released only as provided in subsection (8)(d) of this rule

(8)    Unless expressly prohibited by federal law,    the    following confidential records or information may be released to the Office of the Governor, the Legislature, the Parole Commission, the Department of Legal Affairs,    the    Department    of    Health    and Pehabilitative    Services,    a    private correctional    facility    or    program    that operates under a contract, a state attorney, the court, or a law enforcement agency

(a)    Preplea,    pretrial intervention, presentence and postsentence investigations along with attachments to such reports

(b)    Parole commission records,

(c)    Information identifying    or pertaining to the victim of a crime,

(d)    Other    confidential information, if not otherwise prohibited by

law, upon receipt of a written request demonstrating a need for the records or information

(9)    After victim information has been redacted, access to preplea, pretrial intervention, presentence or postsentence investigations is authorized as follows

(a)    To any other state or local government agency not specified in subsection (8), upon receipt of a written request which includes a statement demonstrating a need for the records or information,

(b)    To an attorney representing an inmate who is under sentence of death, upon receipt of a written request which includes a statement demonstrating a need for the records or information   Such reports on an inmate not represented by the attorney for an inmate under sentence of death shall not be provided,

(c)    To a public defender upon request

Written requests under paragraphs (b) and (c) above must be submitted to the Bureau Chief of Admission and Release for approval if the request pertains to an inmate record   If the request pertains to a report in a supervision file, the request shall be submitted to the correctional probation circuit administrator or designee of the office where such record is maintained   If the request pertains to confidential health information, the request shall be submitted to the institutional chief health officer

(10)    Parties        establishing legitimate research purposes who wish to review   preplea,    pretrial    intervention, presentence and postsentence investigation reports in the records of current or prior inmates   or    offenders   must   obtain   prior approval from the Bureau Chief of Research and Statistics    Parties seeking to review records pursuant to this section shall be required to submit a written request to the Bureau Chief of Admission and Release if the report pertains to an inmate, or to the correctional probation circuit administrator or designee of the office where the record is located   if   the   report   pertains   to   a supervised offender    The written request must disclose the name of the person who is to re ew the records, the name of any organization, corporation, business, school or person for which the research is to be performed   the purpose of the research   any relationship to offenders or the families of

offenders, and a confidentiality agreement must   be   signed    After   submitting   the required written request, research parties must receive written approval as described in this section prior to starting the project

(11)    Any    information,    whether recorded or not, concerning the identity, diagnosis, prognosis or treatment of any inmate or offender which is maintained in connection   with   the   performance   of   any alcohol or drug abuse prevention or treatment function shall be confidential and shall be disclosed only as follows

(a)    With the prior written consent of the inmate or offender    The written consent    shall    include    the    following information

1    The specific name or general designation   of   the   program   or   person permitted to make the disclosure,

2    The   name   or   title   of   the individual or the name of the organization to which disclosure is to be made,

3    The   name   of   the   inmate   or offender,

4    The purpose of the disclosure,

5    How much and what kind of information is to be disclosed,

6    The signature of the inmate or offender, or, when required for an inmate or offender who is incompetent or deceased, the signature of a person authorized to sign in lieu of the inmate or offender,

7    The date on which the consent is signed,

8    A statement that the consent is subject to revocation at any time except to the extent that the program or person which is to make the disclosure has already acted in reliance on it

9    The date, event, or condition upon which the consent will expire if not revoked before    This date, event, or condition must ensure that the consent will last no longer than reasonably necessary to serve the purpose for which it is given   If a request for inmate medical records is submitted upon consent given by the patient inmate/offender, the department's Consent for Inspection And/Or Release of Confidential Information, Form DC4-711B, must be utilized in order to obtain medical records held by the department

(b)    Pursuant to 42 CFR Part 2, the department   is   authorized   to   disclose information about an inmate or offender to

those persons within the criminal justice system who have made participation in the program a condition of the disposition of any criminal proceedings against the inmate or offender or of the inmate or offender's parole or other release from custody if

1    The disclosure is made only to those individuals within the criminal justice system who have a need for the information in connection with their duty to monitor the inmate or offender's progress, and

2    The inmate or offender has signed Form DC4-711B meeting the requirements of subsection (11)(a), except for the revocation provision in (11)(a)8    This written consent shall state the period during which it remains in effect    This period shall be reasonable, taking into account

a    The anticipated length of the treatment,

b    The type of criminal proceeding involved, the need for the information in connection with the final disposition of that proceeding, and when the final disposition will occur, and

c    Such other factors as the program, the inmate or offender, and the persons who will receive the disclosure consider pertinent    The written consent shall state that it is revocable upon the passage of a specified amount of time or the occurrence of a specified, ascertainable event    The time or occurrence upon which consent becomes revocable shall be no later than the final disposition of the action in connection with which consent was given

(c)    A disclosure may not be made on the basis of a consent which

1    Has expired,

2    On its face substantially fails to conform to any of the requirements set forth in (11)(a) above

3    Is known to have been revoked, or

4    Is known, or through a reasonable effort could be known, by the person holding the records to be materially false

(d)    Each disclosure made with the inmate or offender's written consent shall be accompanied by the following written statement

This information has been disclosed to you from records protected by federal confidentiality rules (42 CFR

Part 2)    The federal rules prohibit you from making any further disclosure of this information unless further disclosure is expressly permitted by the written consent of the person to whom it pertains or as otherwise permitted by 42 CFR Part 2    A general authorization for the release of medical or other information is NOT sufficient for this purpose    The federal rules restrict any use of the information to criminally investigate or prosecute any alcohol or drug abuse patient

(e)    Whether or not the inmate or offender has given written consent, 42 CFR Part 2 permits disclosure of information as follows

1    To medical personnel to the extent necessary to meet a medical emergency and for continuity of care,

2    To qualified personnel for the purpose of conducting scientific research, management audits, financial audits, or program evaluation, but such personnel shall not identify, directly or indirectly, any individual inmate or offender in any report of such research, audit, or evaluation, or otherwise disclose inmate or offender identities in any manner

3    To communicate within a program or between a program and an entity having direct administrative control over that program,

4    To law enforcement officers concerning crimes on program premises or against program personnel, or when a threat to commit such a crime has been made,

5    To reports of suspected child abuse and neglect,

6    If authorized by a court order

Specific Authority 20 315, 944 09, 945 10, 945 25 FS    Law Implemented 944 09, 945 10, 945 25, 947 13 FS, 42 USCS 290 ee-3    History--New 10-8-76,    Amended 6-10-85, Formerly 33-6 06, Amended 1-12-89, 7-21-91, 9-30-91, 6-2-92, 8-4-93, 6-12-96, 10-15-97, 6-29-98, Formerly 33-6 006

do not fall within any other special category of these rules may be approved by the warden, the Assistant warden, Classification Supervisor or the next senior officer present in the chain of command in the absence of the warden, on an individual basis based upon the criteria set forth in rule 33-601 707   Such visits may be for any purpose, including

(a)   Visits by persons who do not plan to visit often enough to warrant inclusion in the inmate's visitors list, and

(b)   Visits outside normal visiting days or regular visiting hours, or during the normal work week which will be approved only in exceptional circumstances

(2)   Decisions regarding the approval of special visits may be guided by the number of visits the inmate receives

(3)   Special visits should be requested 10 days in advance and approved 24 hours in advance except when special circumstances make such advance approval impractical

Specific Authority 20 315, 944 09, FS   Law Implemented 944 09 FS   History--New 10-6-83, Formerly 33-5 10, Amended 6-20-85, 3-12-86, 3-8-98, Formerly 33-5 010

### 33-601 711      Legal Visitors

(1)   An attorney may visit an inmate whom he represents if the inmate wishes to confer with the attorney and the attorney presents sufficient identification and evidence of his status as an attorney

(2)   A law student, law clerk or legal paraprofessional working under the supervision of an attorney may visit an inmate whom the attorney represents, subject to all conditions applicable to the attorney, if the attorney provides a signed statement agreeing to supervise the assistant and to accept personal and professional responsibility for all acts of the assistant that may affect the institution, its inmates and staff

(3)   If more requests for visits by attorneys and assistants are received than can be accommodated, attorney visits shall be given priority over visits by assistants

(4)   Legal visits should be scheduled between 8 00 a m  and 5 00 p m , Monday through Friday excluding holidays   A legal visit may be scheduled at other times _____ of the warden or his _____ duling is necessary to _____ ntage to the inmate or

undue hardship to the attorney

(5)   The warden shall provide an adequate area for attorneys and their representatives to visit their inmate clients in order to insure the privacy of such visits,

Specific Authority 20 315, 944 09 FS   Law Implemented 944 09, 944 23 FS   History--New 10-6-83, Formerly 33-5 11, Amended 3-8-98, Formerly 33-5 011

### 33-601 712      Use of Cameras and Tape Recorders by Attorneys

(1)   An attorney may bring and use a camera to photograph his inmate client if he certifies in writing that the physical condition of the inmate client is relevant to a pending or prospective lawsuit, that he needs to photograph the inmate client to preserve evidence of such condition, and that he will comply with reasonable security procedures   No inmate shall be photographed without his consent   Photographs that might jeopardize security by showing the physical layout of the institution or in any other specific way shall not be permitted

(2)   When an attorney visits an inmate he may bring and use a tape recorder or video camera to record the conversation provided he agrees to comply with reasonable security procedures, to tape only his conversations with the inmate, and provided the inmate consents

(3)   The warden or his designee shall impose such requirements regarding inspections of cameras and tape records and the time, place and manner of their use as may be necessary to preserve institutional security

Specific Authority 20 315, 944 09, 944 23 FS   Law Implemented 944 09, 944 23 FS   History--New 1-12-83, Formerly 33-5 091, Amended 3-8-98, 3-23-99, Formerly 33-5 0091

### 33-601 800      Close Management

(1)   Definitions

(a)   Housing supervisor  -  a correctional officer sergeant, or above, who is in charge of the confinement unit for a particular shift

(b)   Clinical health care personnel - a physician, clinical associate, nurse, Correctional Medical Technician Certified (CMTC), psychologist, psychology intern, psychology resident or psychological specialist

DEFENDANT'S EXHIBIT 3

(c)     Close Management (CM) - the confinement of an inmate apart from the general population, for reasons of security or the order and effective management of the institution, where the inmate, through his or her own behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others

(d)     Close Management Levels - the three individual levels (CMI, CMII, and CMIII) associated with close management, with CM I being the most restrictive single cell housing level and CMIII being the least restrictive housing of the three CM levels

(e)     Close Management Plan - a program plan developed for individual inmates determined to be at risk for deterioration of mental health functioning as a result of prolonged confinement  The plan utilizes a variety of therapeutic activities, prevention, and intervention components from available mental health and program resources to prevent potential deterioration of mental health and adaptive functioning

(f)     Close Management Program Team - an interdisciplinary team of representatives from mental health, programs, classification, and security  This team develops and monitors close management plans for individual inmates in close management determined by mental health staff to be at risk for potential deterioration of mental health or adaptive functioning as a result of prolonged confinement

(g)     Review - where used herein, refers to the evaluation of pertinent information or documentation concerning an inmate's confinement status to determine if changes or modifications are required or recommended

(h)     Visit - where used herein, refers to the official tour and inspection of a close management unit by a staff member

(i)     Institutional Classification Team (ICT) - the team consisting of the warden or assistant warden, classification supervisor, and chief of security, that is responsible for making work, program, housing and inmate status decisions at a facility and for making other recommendations to the State Classification Office (SCO)

(j)     Institutional Classification Team Docket - the official record of an ICT hearing

(k)     Major Rule Violation - any

assault, battery or attempted assault or battery, any spoken or written threat towards any person, inciting, attempting to incite or participating in any riot, strike, mutinous act or disturbance, fighting, possession of weapons, ammunition, explosives or escape paraphernalia, and any escape or escape attempt

(l)     Offender Based Information System (OBIS) - the department's computer offender database system which is utilized to organize and store security, classification, program and other offender information

(m)     Restricted Labor Squad - an armed supervision work squad consisting of individually shackled close management II or III inmates who work outside the secure perimeter on institution grounds

(n)     Senior Correctional Officer - a correctional officer lieutenant or above

(o)     Special risk inmate - any inmate who has demonstrated behavior that is harmful to himself or herself

(p)     State Classification Office (SCO) - a staff member at the central office level who is responsible for the review of inmate classification decisions  Duties include approving or rejecting ICT recommendations

(2)     Levels of Close Management

(a)     Close Management I (CMI)

1      Close Management I is the most restrictive single cell housing level of all the close management status designations

2      An inmate assigned to CMI will be ineligible for a work assignment  An inmate may be placed in CMI without having previously been in CMII or III  Any of the following factors constitutes a basis for placement of an inmate in CMI status

a       An incident causing death,

b       An act causing injury or an act which could have resulted in injury to another,

c       The taking of a hostage or an attempt to take a hostage

d       Instigation or incitement of a riot or disorder,

e       Creating or causing property damage in excess of $1,000,

f       Participation in or causing further institutional disruption during a riot or disorder,

g       An escape or escape attempt involving use of a weapon, outside assistance, use of equipment or tools to

penetrate a secure perimeter or violence committed during or while on escape,

h     An escape or escape attempt from a secure perimeter,

i     An escape or escape attempt while under armed supervision while outside the perimeter of the institution,

j     Possession of weapons, ammunition, explosives, flammables, or initiation of or participation in trafficking of these items or trafficking in drugs,

k     Participation in a sexual assault or battery,

l     An inmate who meets the criteria for placement in CMII or CMIII and has been in close management previously during the current period of incarceration,

m     An inmate who is currently in CMII or CMIII and shows an inability to adjust as evidenced by continued disciplinary actions or unsatisfactory ratings,

n     Documented leadership in a security threat group that is certified by the threat assessment review committee in central office

(b)   Close Management II (CMII)

1     CMII is restrictive cell housing which may or may not be restricted to single cell housing

2     An inmate may be placed into CMII without having previously been placed in CMIII  Any of the following factors constitutes a basis for placement of an inmate in CMII status

a     An act or acts in the community, during other periods of confinement, or any circumstances associated with the current period of incarceration such that safety, security, and public safety concerns suggest further review prior to placement in open population,

b     A pattern of predatory actions which makes an inmate a threat to others,

c     An act causing injury or an act which could have resulted in injury to another,

d     An escape or an escape attempt from within the secure perimeter of a facility without violence, the use of weapons, the taking of hostages, the use of equipment or tools, or outside assistance,

e     Participation in riots or disorders during any period of incarceration,

f     A pattern of behavior during the present period of incarceration involving acts of violence or threats of violence,

g     Initiated or participated in a contraband trafficking operation involving negotiables, escape paraphernalia [other than items listed in (2)(a)2 j], or other items that present a threat to the safe and secure operation of the institution or facility,

h     Presents a risk to another inmate's safety and well being in population, as identified by an act or acts which demonstrates an inability to live in general population without endangering others,

i     Has met the criteria for placement in CMIII and has been in close management previously during the current period of incarceration, and

j     Is currently in CM III and shows an inability to adjust as evidenced by continued disciplinary action or unsatisfactory ratings

(c)   Close Management III

1     CMIII is the least restrictive cell housing unit in close management

2     Any of the following factors constitutes a basis for placement of an inmate in CMIII Status

a     An escape or an escape attempt, or a documented history of escape from a non-secure facility or environment without violence, weapons, outside assistance, or the arrest for any other felony while on escape,

b     Assisting or aiding in an escape or an escape attempt,

c     A history of disciplinary action or institutional adjustment reflecting an inability to live in the general inmate population without disrupting the operation of the institution,

d     Participation in a predatory or aggressive act through the use of force or intimidation,

e     Participation in a riot or disorder by refusing to follow orders or staff,

f     Possession of unauthorized drugs, testing positive for drugs on a urinalysis test, possession of negotiables, escape paraphernalia [except items listed in (2)(a)2 j], or other items that present a threat to the safe and secure operation of the institution or facility, and

g     Validated membership in a security threat group that has been certified b, the threat assessment review committee in central office

(3)   Procedures for Placement in

CHAPTER 33-601

Close Management

(a)     Close management is the confinement of an inmate apart from the general population, for reasons of security, or the order and effective management of the institution, where the inmate, through his or her own behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others   The secretary shall designate which institutions are authorized to house close management inmates, based on the needs of the department

(b)     When an inmate in general population has committed acts that threaten the safety of others, threaten the security of the institution, or demonstrate an inability to live in the general population without abusing the rights and privileges of others, the inmate shall be placed in administrative confinement pending close management review   When an inmate in any other confinement status has committed acts that threaten the safety of others, threaten the security of the institution, or demonstrated an inability to live in a segregated population without abusing the rights and privileges of others the inmate shall be housed in his or her current status pending close management review   Inmates being considered for close management who have completed disciplinary confinement and the final decision regarding close management placement has not been determined will be housed in administrative confinement until the review and decision is made by the SCO

(c)     Prior to docketing an inmate's case for close management, the classification supervisor will submit a referral to the senior psychologist for evaluation of the inmate utilizing the Close Management Referral Assessment, DC6-128   Form DC6-128 is incorporated by reference in paragraph (18) of this rule

(d)     Mental health staff will complete the mental health record review within two working days of receipt of Form DC6-128 from the classification supervisor   If the senior psychologist determines that no further evaluation is needed, he or she will forward Form DC6-128 to the classification supervisor with relevant recommendations   If the senior psychologist determines that further evaluation is needed, either the senior psychologist or psychiatrist will conduct an interview and evaluation with the

inmate to determine the treatment needs of the inmate   The senior psychologist or psychiatrist will forward Form DC6-128, Close Management Referral Assessment, to the classification supervisor with the recommendation for the inmate   The recommendation will include the following placement options   unrestricted placement, placement in a close management facility in which there is a provision for out patient mental health services, placement in a close management facility where intensive mental health services are available, or close management not recommended because of the inmate's current mental health condition   A summary of the clinical findings upon which the recommendation is based shall be provided to the classification supervisor

(e)     Upon receiving the mental health assessment the classification supervisor will submit the case for ICT Docket   The ICT will evaluate the recommendations for close management placement and the mental health assessment, interview the inmate, and document its findings and recommendations on the Report of Close Management, Form DC6-233C   Form DC6-233C is incorporated by reference in paragraph (18) of this rule   The inmate will be given a minimum of forty-eight hours to prepare for the review unless waived by completing a Close Management Waiver, Form DC6-265   Form DC6-265 is incorporated by reference in paragraph (18) of this rule   The inmate may present information verbally or in writing for consideration by the ICT   The team will document on Form DC6-233C that the inmate was informed of his or her allotted time to prepare for the review   The ICT is authorized to postpone the case review to allow an inmate additional time to prepare   If an extension of time is given, the team will document such postponement on form DC6-233C

(f)     A staff assistant will be assigned to assist an inmate when the team determines the inmate is illiterate or does not understand English, has a disability that would hinder his ability to represent himself, or when the complexity of the issue makes it unlikely that the inmate will be able to properly represent himself or herself   This assistance can also be offered at the inmate's request   In such event, it is the responsibility of the staff member to explain the close management recommendation

and procedures to the inmate    Even though the staff member will be authorized to assist an inmate during the hearing and aid the inmate in presenting his or her position, the staff member will not take the position of an advocate or defense attorney for the inmate

(g)    ICT Hearing  The inmate will appear at the hearing unless he or she demonstrates disruptive behavior, either before or during the hearing, that impedes the process   In such cases, the review will be completed without the inmate, and the absence or removal of the inmate will be documented on Form DC6-233C   After the interview and review of all pertinent information including the mental health assessment, the ICT will make a recommendation to the SCO   This recommendation will be documented on Form DC6-233C   The ICT will inform the inmate of the basis for its decision and provide a copy of the team's decision to the inmate after the conclusion of the hearing   The classification supervisor will enter the team results in OBIS

(h)    The SCO will review the recommendations of the ICT, the Close Management Referral Assessment, Form DC6-128, and other pertinent information before making the final decision regarding close management placement   This review will be on site and the SCO may interview the inmate, except in situations requiring more immediate action   In these cases, the SCO will review the documentation in OBIS   The SCO will approve, disapprove, or modify the ICT's recommendation or obtain further information from the team before reaching a final decision   If the team's recommendation is disapproved or modified by the SCO, the inmate will be informed of the decision in writing   Inmate notification will not be required when the SCO has approved the ICT's recommendation   After the review is complete, the SCO will document its decision in OBIS

(4)    Transfers From a Non-CM Institution

(a)    Once a recommendation is made, the team will enter the recommendation in OBIS and provide a copy of the DC6-233C reflecting the decision and signatures to the SCO   A copy of the DC6-233C will be kept in the inmate record file

(b)    The inmate will remain in administrative or current confinement status

pending review and final decision of the SCO   If the inmate's release date from disciplinary confinement expires, the inmate shall be placed in administrative confinement until the review and decision is made by the SCO   The SCO will review the recommendation from the ICT and either approve or disapprove the recommendation

(c)    If approved, the SCO will notify the Bureau of Sentence Structure and Transportation for future transfer of the inmate

(d)    If the recommendation is disapproved, the SCO will provide written notification to the ICT of the requesting institution on its decision not to transfer   After the review is complete, the SCO will document its decision in OBIS

(5)    Transfers While Inmate is in CM Status

(a)    If an inmate in close management is reassigned to another level of close management which requires transfer to another institution, the time spent awaiting transfer will be taken into consideration when setting the schedule of reviews by the ICT at the receiving institution

(b)    To transfer an inmate in close management status to another close management facility, the following will occur

1    The ICT from the sending institution will recommend the appropriate level of close management based upon the criteria and facts for placement prior to the transfer

2    Transfers will be limited to those inmates in close management who are being recommended for a close management level that the sending institution is not capable of providing, situations that involve special reviews, or situations that require an inmate to be moved to a higher level facility

(c)    The recommendation by the ICT to transfer a close management inmate will be decided by the SCO   If approved, the SCO will submit notification to the Bureau of Sentence Structure and Transportation for transfer of the inmate

(d)    The receiving institution shall then place the inmate directly into the approved close management status without completing an additional evaluation   If the recommendation is disapproved, the SCO will provide written notification to the ICT of the requesting institution of its decision

not to transfer    After the review is complete, the SCO will document its decision in OBIS

(6)    Close Management Facilities

(a)    The number of inmates housed in a close management cell will not exceed the number of bunks in the cell

(b)    The only exception to Section (6)(a) is during an emergency situation as declared by the warden or duty warden    The emergency will be made known to the regional director and to the emergency action center in the central office    If the exception exists in excess of 24 hours, the warden or duty warden must get specific authorization from the regional director to continue to house inmates beyond the 24 hour period in such conditions

(c)    Prior to placing inmates in the same cell, the inmate will be interviewed by the housing supervisor and a review will be initiated to determine if any of the inmates in the close management unit are a threat to the inmate being placed, or if the inmate being placed is a threat to other inmates in the unit

(d)    If the inmate cannot be placed for these reasons, the housing supervisor will place or maintain the inmate in administrative confinement until the issue can be expeditiously resolved    The case will be immediately forwarded to the ICT for review    The ICT will review the case, interview the inmate, and forward recommendations to the SCO    The SCO will review the case and may interview the inmate and make a final decision on the inmate's placement

(e)    Water Supply to CM Units    All close management cells will be equipped with toilet facilities and running water for drinking and other sanitary purposes    Water in the cell can be turned off when necessary due to misbehavior    Misbehavior is defined as any activity exhibited by an inmate which causes an interruption in the water system and its proper function, such as intentionally clogging a toilet bowl or sink with paper in order to then flood the housing area    It also includes the intentional misuse of the water for such purposes as throwing it on staff or other inmates, or mixing it with another substance for an unauthorized purpose (inmate mixes water with soap or shampoo and apply to the floor or himself or herself to hinder cell extraction)    In such event, the inmate will be furnished with an adequate supply of drinking water by other means to prevent dehydration    This action can be taken in addition to formal disciplinary action being taken against the inmate pursuant to established procedures regarding disciplinary action    Any misbehavior from an inmate and subsequent action by security staff will be documented on the Daily Record of Segregation, Form DC6-229    Form DC6-229 is incorporated by reference in paragraph (18) of this rule

(f)    Prior to placement of an inmate in a close management cell, the cell will be thoroughly inspected by the housing officer to ensure that it is in proper order    The housing officer shall document the cell's condition on Form DC6-221, Cell Inspection    After such time, the inmate housed in that cell will be responsible for the condition of the cell    Form DC6-221 is incorporated by reference in paragraph (18) of this rule

(g)    The close management cells will be physically separate from other confinement cells, and have physical barriers to reduce cross association of those in close management with those in other status confinement when such locations are not possible    They will be built to permit verbal communication and unobstructed observation by the staff    The close management cells will not exceed the number of bunks in the cell, whenever possible, given the physical design of the facility and the number of inmates housed in close management

(7)    Close Management Plan (CMP)

(a)    The close management program team consisting of representatives from mental health, programs, classification, and security will complete a CMP when deemed necessary by mental health clinical staff

(b)    The CMP will be developed based on the inmate's needs assessment and will take into consideration the inmate's CM level

(c)    The CMP will incorporate therapeutic activities and may include prevention and intervention components    The purpose of the plan will be to increase sensory stimulation using a variety of activities from available mental health and program resources

(8)    Conditions and Privileges

(a)    Clothing -- Inmates in close management shall be provided the same

clothing and clothing exchange as the general inmate population unless there are facts to suggest that on an individual basis exceptions are necessary for the welfare of the inmate or the security of the institution   In such cases, the exceptions shall be documented on Form DC6-229 and approved by the chief of security   Shower slides may be substituted for regulation shoes   Any item may be removed from the cell in order to prevent the inmate from inflicting injury to himself or herself or others or to prevent the destruction of property or equipment   If an inmate's clothing is removed, a modesty garment shall be immediately obtained and given to the inmate   If the inmate chooses not to wear the garment, the garment shall be left in the cell and this action shall be documented on Form DC6-229, Daily Record of Segregation   Under no circumstances shall an inmate be left without a means to cover himself or herself

(b)     Bedding and linen -- Bedding and linen for inmates in close management shall be issued and exchanged the same as is provided to the general inmate population   Any exceptions shall be based on potential harm to individuals or a threat to the security of the institution   The shift supervisor or the senior correctional officer must approve the action initially   Such exceptions shall be documented on Form DC6-229 and the chief of security shall make the final decision in regard to action no later than the next working day following the action

(c)     Personal Property -- Inmates shall be allowed to retain personal property including stamps, watches, rings, writing paper, envelopes and health and comfort items unless there is a indication of a security problem   Exceptions or removal of any item will be documented on the DC6-229   An Inmate Impounded Personal Property List, Form DC6-220, will be completed by security staff and signed by the inmate designating what personal items were removed   The original will then be placed in the inmate's property file and a copy of the form will be given to the inmate for his or her records   Radios are not authorized for an inmate in close management   Form DC6-220 is incorporated by reference in Rule 33-602 220

(d)     Comfort Items -- Inmates in close management shall be permitted personal

hygiene items and other medically needed or prescribed items such as eye glasses or hearing aids, except when security requirements dictate otherwise   Inmates in close management shall not possess any products that contain baby oil, mineral oil, cocoa butter, or alcohol   In the event certain ' items that inmates in close management are not normally prohibited from possessing are removed, the senior correctional officer shall be notified and must approve the action taken, or the item must be returned to the inmate   Action taken shall be recorded on the Daily Record of Segregation, Form DC6-229, which must be reviewed by the chief of security   When any personal property is removed, an Inmate Impounded Personal Property List, Form DC6-220, designating what personal items were removed, shall be completed by security staff and signed by the inmate   The following comfort items shall be provided as a minimum toothbrush, toothpaste, bar of soap, towel or paper towels, and feminine hygiene products for women, and toilet tissue

(e)     Personal Hygiene--Inmates in close management shall meet the same standards in regard to personal hygiene as required of the general inmate population

1     At a minimum each inmate in confinement shall shower three times per week and on days that the inmate works

2     Male inmates shall be required to shave at least three times per week   Hair care shall be the same as that provided to and required of the general population inmates

(f)     Diet and Meals--All inmates in close management shall receive normal institutional meals as are available to the general inmate population except that if any item on the regular menu might create a security problem in the confinement area, then another item of comparable quality shall be substituted   An alternative meal (special management meal) may be provided for any inmate in close management who uses food or food service equipment in a manner that is hazardous to himself or herself, staff, or other inmates   The issuance of a special management meal will be in strict accordance with rule 33-602 223   Any deviation from established meal service is to be documented by security staff on the Daily Record of Segregation, Form DC6-229

(g)     Canteen Items   Inmates in CMI

and II will be allowed to make canteen purchases once per month unless restricted by disciplinary action   Canteen purchases are subject to the following limitations, unless modified by the ICT

1     Inmates in CMI and II will be restricted to a limit of five non-food items   In making this determination, with the exception of stamps and notebook paper, it is the number of non-food items that is counted not the type of item   For example, three security pens counts as three items, not one item   Twenty-five stamps or fewer will count as one item and two packages or less of notebook paper will count as one item

2     Inmates in CMIII will be allowed to make canteen purchases once every two weeks unless restricted by disciplinary action   Canteen purchases are subject to the following limitations, unless modified by the ICT   Inmates in CMIII will be restricted to five non-food items and four food items   In making the determination for food, it is the number of food items that is counted not the type of item   For example, three packages of cookies count as three items, not one item

3     Any   disciplinary   reports received by an inmate between the time that he or she requests canteen food items and the delivery of those items will result in disapproval of the requested items

4     The ICT has the authority to suspend privileges for canteen purchases when the inmate fails to comply with the rules and procedures established for close management   Any action taken by the ICT regarding the suspension or limiting of privileges will be documented    on    the    Daily    Record    of Segregation, DC6-229

(h)     Religious     Accommodations Inmates in close management status shall be allowed    to    participate    in    religious ceremonies that can be accomplished at cell-side (for example, communion)   Additionally, close management inmates shall be allowed to possess religious literature and have access to a spiritual advisor or clergy visit with citizen clergy persons at a time and location approved by the warden

(i)     Counseling     Interviews     – Counseling   shall   be   provided   to   close management inmates in-cell or out-of cell when deemed necessary by mental health staff   The ICT will determine whether an inmate in close management may be removed from his or her cell to attend any counseling session

when they determine that it is safe to do so, or whether counseling must take place in-cell

(j)     Legal Access -- An inmate in close management will have access to his or her personal legal papers and law books and have correspondence access with the law library   Access to the law library will be obtained   through   delivery   of   research materials to an inmate's cell, and access to visits with certified inmate law clerks   Although the inmate may not be represented by an attorney at any administrative hearing, access to an attorney or aide to that attorney will be granted for legal visits at any reasonable time during normal business hours     Indigent inmates will be provided paper and writing utensils in order to prepare legal papers   Inmates who are not indigent will be allowed to purchase paper and envelopes for this purpose by completing Form DC6-251, CMI and II Canteen Order, or Form DC6-252, CMIII Canteen Order, within the stated time frames   Forms DC6-251 and DC6-252   are   incorporated   by   reference   in paragraph (18) of this rule   Typewriters or typing services are not considered required items   and   will   not   be   permitted   in confinement cells   Inmates with disabilities that   hinder   the   preparation   of   legal correspondence will be allowed the use of auxiliary aids (writer/reader)   An inmate who is provided an auxiliary aid shall also be allowed access to a certified law clerk for the purpose of preparing legal documents, legal mail, and filing grievances

(k)     Correspondence -- Inmates in close   management   shall   have   the   same opportunities   for   correspondence   that   are available to the general inmate population

(l)     Writing utensils -- Inmates in close management shall possess only security pens   Other types of pens or pencils shall be confiscated and stored until the inmate is released from close management status   If a security pen is not available, the inmate shall be allowed to sign out a regular pen from the confinement unit officer   All care shall be taken to ensure that an inmate who requests access to a pen in order to prepare legal documents or legal mail or to file a grievance with the department has access to a pen for a time period sufficient to prepare the legal mail, documents, or grievances   An inmate    who    has    been    provided    a "writer/reader" will be allowed access to

such for the purpose of reading and preparing correspondence

(m)     Reading materials -- Reading materials, including scriptural or devotional materials and books that are in compliance with admissibility requirements, are allowed in close management units unless there is an indication of a threat to the safety, security, or sanitation of the institution If it is determined that there is a safety, security or sanitation risk, the items will be removed      Such removal of reading materials will be documented on Form DC6-229, Daily Record of Segregation  An inmate who receives services from the Bureau of Braille and Talking Book library will be allowed to have his tape player, devotional or scriptural material tapes, and other books on tape which are in compliance with Rule 33-501 401, F A C

(n)     Exercise -- Those inmates confined on a 24-hour basis excluding showers and clinic trips may exercise in their cells If the inmate requests a physical fitness program handout, the wellness specialist or the confinement officer shall provide the inmate with an in-cell exercise guide and document such on the Daily Record of Segregation, Form DC6-229    However, if confinement extends beyond a 30-day period, an exercise schedule shall be implemented to ensure a minimum of three hours per week of exercise out of doors  The assignment and participation of an inmate on the restricted labor squad or other outside work squad required to work outside at least one day per week will satisfy the minimum exercise requirements for the week   Such exercise periods shall be documented on Form DC6-229 The ICT is authorized to restrict exercise for an individual inmate only when the inmate is found guilty of a major rule violation In this instance, a major rule violation is defined as  any assault, battery or attempted assault or battery, any spoken or written threat towards any person, inciting, attempting to incite or participating in any riot, strike, mutinous act or disturbance, fighting, possession of weapons, ammunition, explosives or escape paraphernalia, escape or escape attempt  Inmates shall be notified in writing of this decision and may appeal through the grievance procedure  The denial of exercise shall be for no more than 15 days per incident and for no longer than 30 days in cumulative length   Medical restrictions

determined by health services staff can also place limitations on the amount and type of exercise permitted   Such restrictions of exercise periods will be documented on the Daily Record of Segregation, Form DC6-229  A disabled inmate who is unable to participate in the normal exercise program will have an exercise program developed for him that will accomplish the need for exercise and take into account the particular inmate's limitations

(9)     Programs and Privileges in Close Management Units

(a)     While in a close management unit, an inmate's movement within the institution and contacts with other individuals will be restricted   Privileges will also be limited depending on the specific close management level

(b)     CMI Privileges for an inmate assigned to CMI who maintains a satisfactory adjustment are as follows

1        Participation in available approved programs that the inmate can perform within the cell after a minimum period of at least 60 days with a clear disciplinary record since assignment to close management,

2        Check out one soft-back book from the library at least once per week and possess no more than one soft back book at any given time   An inmate who receives services from the Bureau of Braille and Talking Book Library will be allowed to check out one book on tape per week and possess no more than one at any given time, even though the actual number of tapes may be more than one per book

3        Conduct routine inmate bank transactions once per month,

4        Subscribe to one magazine as provided for in rule 33-602 401 and possess no more than four issues at any given time, an inmate who receives services from the Bureau of Braille and Talking Book Library will be allowed to receive up to four issues of a magazine,

5        Make emergency telephone calls and telephone calls to an attorney as explained in rule 33-602 205,

6        Receive a personal visit after completing 60 days of satisfactory adjustment in close management status and having maintained a clear disciplinary record since assignment to close management   If found guilty of any disciplinary infractions while assigned to CMI, the inmate is eligible to be

considered for visits 60 days following release from disciplinary confinement or the disciplinary hearing

7     The inmate is eligible to receive personal visits after each subsequent 60 day period with a continued clear disciplinary record and satisfactory adjustment while in the status unless security or safety concerns would preclude a visit   All visits for CMI inmates in CMI will be non-contact visits

(c)     CMII   In addition to the programs provided for CM I inmates and those privileges outlined in (9)(b)1 -5 of this rule, cell front counseling and program offerings shall be made available to inmates who desire to participate   CMII inmates will be eligible to receive personal visits

1     After completing 30 days of satisfactory adjustment in close management status and having maintained a clear disciplinary record since being assigned to close management

2     If found guilty of any disciplinary infraction while assigned to CMII, the inmate is eligible to be considered for visits 30 days following release from disciplinary status or the disciplinary hearing if a penalty other than disciplinary confinement was imposed, with a continued clear disciplinary record

3     The inmate is eligible to receive personal visits after each subsequent 30 day period with a continued clear disciplinary record and satisfactory adjustment while in the status unless security and safety concerns would preclude a visit   All visits for inmates in CMII will be non-contact visits

(d)     CMIII   In addition to the privileges provided above for CM I inmates, and those privileges outlined in (9)(b) 1 -5 of this rule, cell front or out of cell counseling and program offerings shall be made available to inmates who desire to participate   CM III inmates will be entitled to the following

1     A   personal visit after completing 30 days of satisfactory adjustment in close management status and having maintained a clear disciplinary record since being assigned to close management

2     If found guilty of a disciplinary infraction while assigned to CM III, the inmate is eligible to be considered for visits 14 days following release from

disciplinary status or the disciplinary hearing if a penalty other than disciplinary confinement was imposed, and the inmate has a continued clear disciplinary record

3     The inmate is eligible to receive personal visits after each subsequent 14 day 'period with a continued clear disciplinary record and satisfactory adjustment while in the status unless security or safety concern would preclude a visit   The warden will determine the conditions of the visit, whether the visit is to be contact or non-contact, and the level of supervision and restraint required

4     Day room privileges after six continuous months with a clear disciplinary record and above satisfactory adjustment within the close management unit unless security and safety concerns would preclude day room activities   This privilege will be limited to once per week for up to two hours in duration

(10)     Suspension Of Privileges

(a)     In addition to the suspension of privileges through disciplinary action, the ICT has the authority to suspend privileges for inmates in close management status who fail to comply with the rules and procedures established for close management

(b)     The ICT shall suspend an inmate's privileges if security and safety concerns would preclude an inmate from receiving certain privileges   Any action taken by the ICT regarding the suspension or limiting of privileges will be documented on the Daily Record of Segregation, Form DC6-229   Privileges suspended by the ICT in excess of 90 days will require the review and approval of the SCO

(11)     Work Assignments

(a)     The decision to make work assignments and the type of assignments made will be determined by the ICT   Inmates shall be provided the opportunity for work assignment consideration as determined by the ICT except when precluded by doctor's orders for medical reasons

(b)     CMI inmates are restricted from all outside cell work activities   CMII inmates are only eligible for work assignments on restricted labor squads or in CMI, II, or death row housing units   CM III inmates are eligible for work assignments either inside or outside the close management unit, including restricted labor squads, work assignments within other close management

units, and work assignments usually designated for open population inmates

(c)    Outside work assignments shall be performed during day light hours

(12)    Restraint and Escort Requirements

(a)    Prior to opening a cell for any purpose, including exercise, medical or disciplinary call-outs, telephone calls, recreation, and visiting, all inmates in the cell shall be handcuffed behind their backs If documented medical conditions require that inmates be handcuffed in front, the escort officers shall be particularly vigilant

(b)    A minimum of two officers shall be physically present at the cell whenever the cell door is opened

(c)    Prior to escorting an inmate from a cell the inmate shall be thoroughly searched    If the inmate is being taken outside the immediate housing unit, leg irons and other restraint devices shall be applied

(d)    Due to the unique mission of close management units, it is understood that more than one inmate may be out of his or her cell within the unit at any one time However, whenever inmates are being escorted in restraints, there shall be one officer with each inmate and the inmates shall be kept at a distance from each other which would preclude any unauthorized physical contact

(13)    Contact by Staff

(a)    The following staff members shall be required to officially inspect and tour the close management unit    All visits by staff shall be documented on the Inspection of Special Housing Record, Form DC6-228    Form DC6-228 is incorporated by reference in paragraph (18) of this rule    The staff member shall also document his or her visit on the Daily Record of Segregation, Form DC6-229, if there is any discussion of significance, action or behavior of the inmate, or any other important evidential information which may have an influence or effect on the status of confinement    These visits shall be conducted at a minimum of

1    At least every 30 minutes by a correctional officer, but on an irregular schedule

2    Daily by the housing supervisor

3    Daily by the officer-in-charge on duty for all shifts except in case of riot or other institutional emergency

4    Daily by a clinical health care person

5    Weekly by the chief of security (when on duty at the facility) except in case of riot or other institutional emergency

6    Weekly by the chaplain More frequent visits shall be made upon request of the inmate if the chaplain's schedule permits

7    Weekly by a psychologist or his or her mental health staff designee

8    Weekly by the warden and assistant wardens

9    At least once a week by a classification officer

10    At least once a month by a member of the ICT to ensure that the inmate's welfare is properly provided for, and to determine the time and method of release or any program changes

(14)    Special Risk Inmates

(a)    Any inmate who has demonstrated behavior that is or could be harmful to himself or herself shall be designated as a special risk inmate    If the inmate demonstrates bizarre, mentally disordered, or self-destructive behavior, the health services department shall be immediately contacted to determine if special watch or suicide watch procedures shall be initiated

(b)    Suicidal inmates shall be removed to a designated area where a correctional officer or health care staff provides observation    Visual checks shall be made in accordance with medical protocols or at least every 30 minutes and shall be documented on Form DC4-650, Observation Checklist/Restraint Observation Checklist, until the inmate is no longer considered a special risk inmate    All actions taken by staff with regard to special risk inmates shall be documented on Form DC6-229 and followed with an Incident Report, Form DC6-210    Form DC4-650 is incorporated by reference in paragraph (18) of this rule Form DC6-210 is incorporated by reference in Rule 33-602 210

(15)    Review of Close Management

(a)    An ICT member shall review inmates in close management at least once every week for the first 60 days and once every 30 days thereafter    The purpose shall be toward reducing the inmate's status to the lowest management level or returning the

CLASSIFICATION AND CENTRAL RECORDS

CHAPTER 33-601

inmate to general population as soon as the facts of the case indicate that this can be done safely

(b)    Any inmate assigned to close management for more than 30 days shall be given a psychological screening assessment by mental health professional staff to determine the inmate's mental condition    The assessment shall include a personal interview if deemed necessary by mental health staff All such assessments shall be documented in the mental health record    The psychologist or psychological specialist shall prepare a report to the ICT with the facts of the case The ICT shall then make a decision regarding continuation    of    confinement    Any recommendations    by    the    psychologist    or psychological specialist that the inmate be released    from    close    management    shall    be forwarded    by    the    ICT    to    the    SCO    If    the decision is to continue confinement, a new psychological screening assessment shall be completed at least every 90-day period

(c)    The close management program team (CMPT) will review each CMP at least 30 days after the implementation of the plan and at least every 60 days thereafter    However, the CMPT shall meet within 7 days if mental health staff determine that more immediate attention is required    All changes and or modifications will be documented on the inmate's CMP    The CMPT's review (and interview, if necessary) will include the following

1    A status assessment of the inmate's participation,

2    A status evaluation of the close management plan's objectives and goals, and the ability to meet the inmate's needs,

3    A determination if changes or modifications to the current plan are needed

4    The CMP will be available in the CM unit    The original will be placed in the mental health record    All changes to the plan will be attached to the original mental health record and the copy maintained in the CM unit

5    All services provided by any mental health or program staff member shall be recorded on the Close Management Activity Participation Log, Form DC6-129, which shall be kept in the officers' station of the CM unit    When the form has been completely filled-out or the inmate has been released from the CM unit, a copy shall be placed in the inmate file and the original shall be

filed in the mental health record    Form DC6-129 is incorporated by reference in (18) of this rule

(d)    When an inmate has not been released to general population and is in any close management status for six months, the classification officer shall interview the inmate and shall prepare a formal assessment and    evaluation    on    the    Report    of    close management    Such reports shall include a brief paragraph detailing the basis for confinement, what has transpired during the six month period, and whether the inmate should be released, maintained at the current level,    or    reduced    to    a    lower    level    of management    The case shall be forwarded to the    classification    supervisor    who    shall docket the case for ICT review

(e)    The    ICT    shall    review    the report of close management prepared by the classification officer, insert any other information regarding the inmate's status and interview    the    inmate    The    ICT's recommendation shall be documented in OBIS and the Report of Close Management, Form DC6-233C    If    it    is    determined    that    no justifiable safety and security issues exists for the inmate to remain in close management the ICT shall forward their recommendation for release to the SCO for review    For an inmate to remain in close management the ICT shall justify the safety and security issues or circumstances that can only be met by maintaining the inmate at the current level or a lower level of management

(f)    The    SCO    shall    conduct    an onsite interview with each inmate at least once    every    six    months    or    as    often    as necessary    to    determine    if    continuation, modification,    or    removal    from    close management status is appropriate    The SCO shall review all reports prepared by the ICT concerning    an    inmate's    close    management status and may interview the inmate before determining    the    final    disposition    of    the inmate's close management status    If it is determined that no justifiable safety and security issues exist for the inmate to remain in close management the SCO shall cause the inmate to be immediately released For an inmate to remain in close management, the SCO shall determine based on the reports and documentation that there are safety and security    issues    or    circumstances    for maintaining the inmate at the current level or at a lower level of management    The SCO's

decision shall be documented in OBIS and the Report of Close Management, Form DC6-233C The ICT shall advise the inmate of the SCO's decision

(16)    Close Management Records

(a)    A Report of Close Management, Form DC6-233C, shall be kept for each inmate placed in close management

(b)    A Daily Record of Segregation, Form DC6-229, shall be maintained for each inmate as long as he is in close management Form DC6-229 shall be utilized to document any activities, including cell searches, items removed, showers, recreation, haircuts and shaves    If items that inmates in close management are not prohibited from possessing are denied or removed from the inmate, the shift supervisor or the senior correctional officer must approve the action initially The Central Office ADA coordinator shall be contacted within 24 hours if any item is removed that would be considered an auxiliary aid or device that ensures a disabled inmate an equal opportunity as a non-disabled inmate   The items denied or removed shall be documented on Form DC6-229 and the chief of security shall make the final decision in regard to the action no later than the next working day following the action    The confinement housing officer shall make a notation of any unusual occurrences or changes in the inmate's behavior and any action taken   Changes in housing location or any other special action shall also be noted Form DC6-229 shall be maintained in the housing area for 30 days   After each 30 day review of the inmate, Form DC6-229 shall be forwarded to the ICT for review    Once reviewed, these forms shall be forwarded to classification to be filed in the institutional inmate record

(c)    An Inspection of Special Housing Record, Form DC6-228, shall be maintained in each close management area Each staff person shall sign the record when entering and leaving the confinement area Prior to leaving the confinement area, each staff member shall indicate any specific problems, including any inmate who requires special attention   Upon completion, Form DC6-228 shall be maintained in the housing area and forwarded to the chief of security on a weekly basis where it shall be maintained on file pursuant to the current retention schedule

(17)    Staffing Issues

(a)    Officers assigned to a confinement unit shall be rotated to another assignment every 18 months for a period of at least one year   Any officer assigned to a confinement post shall be authorized a minimum period of five days annual leave or a five day assignment to a less stressful post every six months

(b)    The Inspector General shall notify the warden and regional director of any officer involved in eight or more use of force incidents in an 18 month period   The regional director shall review the circumstances for possible reassignment

(18)    Forms   The following forms referenced in this rule are hereby incorporated by reference   Copies of any of these forms are available from the Forms Control Administrator, Office of the General Counsel, Department of Corrections, 2601 Blair Stone Road, Tallahassee, Florida 32399-2500

(a)    Form DC4-650, Observation Checklist/Restraint Observation Checklist, effective date 2-1-01

(b)    Form DC6-128, Close Management Referral Assessment, effective date 2-1-01

(c)    Form DC6-129, Close Management Activity Participation Log, effective date 2-1-01

(d)    Form DC6-221, Cell Inspection, effective date 2-1-01

(e)    Form DC6-228, Inspection of Special Housing Record, effective date 2-1-01

(f)    Form DC6-229, Daily Record of Segregation, effective date 2-1-01

(g)    Form DC6-233C, Report of Close Management, effective date 2-1-01

(h)    Form DC6-251, CMI and II Canteen Order, effective date 2-1-01

(i)    Form DC6-252, CMIII Canteen Order, effective date 2-1-01

(j)    Form DC6-265, Close Management Waiver, effective date 2-1-01

Specific Authority 944 09 FS Law Implemented 944 09 FS History—Formerly 33-601 801- 813, substantially amended 2-1-01

33-601 801    Close Management - General

Specific Authority 944 09 FS Law Implemented 944 09 FS    History -- Transferred from 33-3 0083, 10-01-95, Amended 4-14-98, Formerly 33-38 001, Repealed 2-1-01, see 33-601 800

33-601 802    Levels of Close

Management
Specific Authority 944 09 FS   Law Implemented
944 09 FS   History -- Transferred from 33-
3 0083, 10-01-95, Amended 4-14-98, Formerly
33-38 002, Repealed 2-1-00, see 33-601 800

**33-601 803   Privileges   in   Close
Management**
Specific Authority 944 09 FS   Law Implemented
 944 09 FS   History -- Transferred from 33-
3 0083, 10-01-95, Amended 4-14-98, 9-2-98,
Formerly 33-38 003, Repealed 2-1-01, see 33-
601 800

**33-601 804   Close Management Review
Team**
Specific Authority 944 09 FS   Law Implemented
944 09 FS   History -- Transferred from 33-
3 0083, 10-01-95, Formerly 33-38 004, Repealed
2-1-01, see 33-601 800

**33-601 805   Assignment   to   Close
Management**
Specific Authority 944 09 FS   Law Implemented
944 09 FS   History -- Transferred from 33-
3 0083, 10-01-95, Formerly 33-38 005, Repealed
2-1-01, see 33-601 800

**33-601 806   Review of Assignment to
Close Management**
Specific Authority 944 09 FS   Law Implemented
944 09 FS   History -- Transferred from 33-
3 0083, 10-01-95, Amended 4-14-98, Formerly
33-38 006, Repealed 2-1-01, see 33-601 800

**33-601 807   Close   Management   -
Warden's Responsibility**
Specific Authority 944 09 FS   Law Implemented
944 09 FS   History -- Transferred from 33-
3 0083, 10-01-95, Amended 4-14-98, Formerly
33-38 007, Repealed 2-1-01, see 33-601 800

**33-601 808   Close   Management   -
Regional Director's Responsibility**
Specific Authority 944 09 FS   Law Implemented
944 09 FS   History -- Transferred from 33-
3 0083, 10-01-95, Amended 4-14-98, Formerly
33-38 008, Repealed 2-1-01, see 33-601 800

**33-601 809   Close Management - Case
Management Responsibilities**
Specific Authority 944 09 FS   Law Implemented
944 09 FS   History -- Transferred from 33-
3 0083, 10-01-95, Amended 4-14-98, Formerly
33-38 009, Repealed 2-1-01, see 33-601 800

**33-601 810   Close   Management
Facilities**
Specific Authority 944 09 FS   Law Implemented
944 09 FS   History -- Transferred from 33-
3 0083, 10-01-95, Amended 4-14-98, Formerly
33-38 010, Repealed 2-1-01, see 33-601 800
　‘

**33-601 811   Close   Management   -
Other Conditions and Privileges**
Specific Authority 944 09 FS   Law Implemented
944 09 FS   History -- Transferred from 33-
3 0083, 10-01-95, Formerly 33-38 011, Repealed
2-1-01, see 33-601 800

**33-601 812   Close   Management
Records and Forms**
Specific   Authority   944 09   FS   Law
Implemented   944 09   FS   History --
Transferred from 33-3 0083, 10-01-95, Amended
4-14-98, Formerly 33-38 012, Repealed 2-1-01,
see 33-601 800

**33-601 813   Close Management - Rule
Change Implementation**
Specific Authority 944 09 FS   Law Implemented
944 09 FS History -- New 10-01-95, Formerly
33-38 013, Repealed 2-1-01, see 33-601 800

**33-601 820   Maximum Management**
(1)   General   Maximum Management
is a temporary status for an inmate who,
through a recent incident or a series of
recent incidents, has been identified as
being an extreme security risk to the
Department and requires an immediate level of
control beyond that available in close
management or death row
(2)   Definitions
(a)   Close Management I (CM I) -
the most restrictive single cell housing
level of all the close management status
designations
(b)   Institutional   Classification
Team (ICT) - refers to the team responsible
for making local classification decisions
The Institutional Classification Team shall
be comprised of the Warden or Assistant
Warden who shall serve as Chairperson,
Classification Supervisor, Chief of Security,
and other members as necessary when appointed
by the warden or designated by rule
(c)   Maximum   Management   (MM)   -
refers to a temporary status for an inmate
who, through a recent incident or series of
recent incidents, has been identified as
being   an   extreme   security   risk   to   the

## STATE OF FLORIDA
## DEPARTMENT OF CORRECTIONS

## OFFICE OF THE DEPUTY SECRETARY

| | |
|---|---|
| **MEMO TO:** | Regional Directors of Institutions<br>Wardens |
| **FROM.** | Richard L Dugger |
| **DATE:** | July 20, 2001 |
| **SUBJECT:** | **CLOSE MANAGEMENT OPERATIONAL CHANGES** |

The following are a broad range of changes in the operation of our Close Management units encompassing programs, security, operational and physical plant requirements   These changes are effective immediately with implementation to follow as quickly as the logistical considerations can be addressed and operational methodology developed   Implementation of the following elements is a high priority for the department and your concerted efforts to effect the changes as soon as possible is expected   We will begin developing the appropriate rule changes, as well as changes in the statewide post orders to insure consistency in the application of these changes   In the interim you are to implement locally these changes in a manner determined by you and your staff to be safe and workable   Several of these items will require that you work cooperatively with facilities and/or program staff to implement   It is important that you, as the Warden of your facility, be aware of all aspects of the changes needed and take a leadership role in seeing that everything is accomplished in an expedient and safe manner

1   The external visual shielding on the windows of all Close Management cells are to be removed immediately   You are to document and maintain a record for subsequent review of all disruptive incidents, if any, which are directly a result of this removal

2   Efforts are to be made immediately to identify any available, suitable materials from which exercise stations similar to those currently in place inside the CM dormitories can be fabricated   These are to be fabricated as soon as possible utilizing inmate labor and securely installed in as many of the outdoor CM exercise yards as possible   CM inmates should then be allowed equal access to the areas with the exercise stations if it is not possible to equip them all

3   Close Management inmates at all levels are allowed to possess a "Walkman" type radio with headphones as is now allowed for general population inmates   Inmates in Close Management who currently have such radios in stored property will have the radios immediately returned to them   Those without radios, and who have funds to do so, should be allowed to purchase them from the inmate canteen   The radio, as with other such privileges may be subject to withdrawal in

DEFENDANT'S
EXHIBIT
4

accordance with a guilty finding for a disciplinary infraction or other valid justification as may be provided for in the FAC

**MEMO:** CLOSE MANAGEMENT OPERATIONAL CHANGES
July 20, 2001
Page 2

4    Close Management inmates at all levels are permitted to obtain up to three soft cover books per week from the institutional library and will be permitted one magazine subscription (with no more than four issues in the cell at one time)   Additionally, they are allowed one newspaper subscription (with no more than four issues in the cell at a time)   Again this privilege is subject to withdrawal in accordance with a guilty finding for a disciplinary infraction or other valid justification as may be provided for in the FAC

5    Canteen privileges for Close Management inmates are increased as follows

- CM I and II inmates, following 30 days satisfactory adjustment, may have canteen privileges once each week and may purchase up to 5 non-food items and 5 food items
- CM III inmates, following a 30 day satisfactory adjustment period, may have canteen privileges once each week and may purchase up to 5 non-food items and 10 food items

     NOTE   If an inmate is transferred to a less restrictive level due to satisfactory adjustment, the adjustment period is waived   Again, this privilege is subject to withdrawal in accordance with a guilty finding for a disciplinary infraction or other valid justification as may be provided for in the FAC

6    Visitation privileges for Close Management inmates are increased as follows

- CM I inmates, after 30 days of satisfactory adjustment, are allowed one two hour, non-contact visit every 30 days by appointment
- CM II inmates, after 30 days of satisfactory adjustment, are allowed one two hour non-contact visit every 14 days by appointment
- CM III inmates, after 30 days of satisfactory adjustment, are allowed one two hour contact visit every 14 days by appointment

     NOTE   If an inmate is transferred to a less restrictive level due to satisfactory adjustment, the adjustment period is waived   Again, this privilege is subject to withdrawal in accordance with a guilty finding for a disciplinary infraction or other valid justification as may be provided for in the FAC

7    Telephone access will be allowed as follows (contact has been made with our inmate telephone contract vendor and provisions for the necessary cordless telephones are underway at this time, these are collect, recorded and monitored calls just as those allowed general population)

- CM I inmates are allowed 1 call of standard duration every 30 days following 30 days of satisfactory adjustment
- CM II inmates are allowed 1 call of standard duration every 14 days after 30 days of satisfactory adjustment

**MEMO: CLOSE MANAGEMENT OPERATIONAL CHANGES**
July 20, 2001
Page 3

- CM III inmates are allowed 1 call of standard duration every 7 days after 30 days of satisfactory adjustment

  NOTE If an inmate is transferred to a less restrictive level due to satisfactory adjustment, the adjustment period is waived   Again, this privilege is subject to withdrawal in accordance with a guilty finding for a disciplinary infraction or other valid justification as may be provided for in the FAC

8   Day room social access including entertainment television will be afforded Close Management inmates as follows

- CM II inmates, following 30 days satisfactory adjustment, may be allowed access to the day room area for social purposes to include watching entertainment television for up to two days per week, not to exceed 4 hours per occasion or to extend beyond 8 00 PM in the evening   This is allowed when it does not conflict with organized program activities   The number of participants at any one time will be determined by the Shift Supervisor in consultation with the Duty Warden   This determination will be based on such considerations as, day room size and/or availability of seating, safety and security issues associated with the availability of supervising staff as well as staff available for response should a problem develop

- CM III inmates, following 30 days satisfactory adjustment, may be allowed access to the day room for social purposes to include watching entertainment television for up to 5 days per week   The same stipulations, limitations and restrictions apply as provided for CM II above

  NOTE If an inmate is transferred to a less restrictive level due to satisfactory adjustment, the adjustment period is waived   Again, this privilege is subject to withdrawal in accordance with a guilty finding for a disciplinary infraction or other valid justification as may be provided for in the FAC

9   In order to facilitate more expedient movement and in recognition of staffing limitations, the institutional Warden is authorized to allow CM III inmates to be escorted to the shower and exercise without restraints   This is at the Warden's discretion and may apply to all, any part or none of the assigned CM III population based upon the Warden's determination of the security and safety needs of his/her individual institution/ CM unit

10 In-cell educational opportunities for Close Management inmates will be available to all CM levels following 60 days of satisfactory adjustment   NOTE   If an inmate is transferred to a less restrictive level due to satisfactory adjustment, the adjustment period is waived

11 Wellness services for CM inmates at all levels will be enhanced by providing cell-front tutoring in such areas as tobacco cessation, wellness education puzzles and the wellness education course

12 Increased volunteer participation will be recruited, where possible, to assist them with chaplaincy and educational services

**MEMO·  CLOSE MANAGEMENT OPERATIONAL CHANGES**
July 20, 2001
Page 4

We fully realize that the above changes represent a significant challenge for all of you, particularly in light of the acutely brief time frame available to implement   All that is expected is that you employ your best resourcefulness and the concerted best effort of you and your staff   With this effort, I am certain we will accomplish what needs to be done

If further information is required, please contact my office or James Upchurch, Chief of Security Operations

_____

Deputy Secretary

JLV/JRU/jh
C       Michael W Moore, Secretary
        Peggy Ball, Chief of Staff
        Louis A Vargas, General Counsel
        Jerry L Vaughan, Director of Institutions
        Richard J Nimer, Director of Program Services
        George Denman, Deputy Director of Institutions
        James R Upchurch, Chief of Security Operation
        Operations file

## SHEET 1  PAGE 1

```
                                                              1
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                     MIAMI DIVISION

 3   MARK OSTERBACK, et al ,

 4           Plaintiffs,

 5   vs                        CASE NO   97-2806-CIV-HUCK

 6   MICHAEL W  MOORE, et al ,

 7           Defendants                /

 8   _____/

 9

10   DEPOSITION OF            DR   JANICE SPANN

11   TAKEN AT THE INSTANCE OF   The Plaintiffs

12

13   DATE                    Tuesday  August 14  2001

14
     TIME                    Commenced at 3 35 p m
15                           Concluded at 4 42 p m

16
     LOCATION                2601 Blairstone Road
17                           Tallahassee, Florida

18
     REPORTED BY             NANCY P  VETTERICK  R P R
19                           Certified Court Reporter
                             Notary Public in and for the
20                           State of Florida at Large

21
              ACCURATE STENOTYPE REPORTERS  INC
22                     100 Salem Court
              Tallahassee, Florida 32301
23                    (850)  878-2221

24

25


              ACCURATE STENOTYPE REPORTERS, INC
```

## PAGE 3

```
                                                              3
 1                         INDEX

 2   WITNESS

 3   DR   JANICE SPANN

 4   Direct Examination by Mr  Siegel               4

 5

 6                    * * * * * *

 7

 8

 9

10   CERTIFICATE OF OATH                           50

11   CERTIFICATE OF REPORTER                       51

12                    * * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25


              ACCURATE STENOTYPE REPORTERS, INC
```

## PAGE 2

```
                                                              2
 1   APPEARANCES

 2             REPRESENTING THE PLAINTIFFS

 3             PETER M  SIEGEL, ESQUIRE
              RANDALL BERG  ESQUIRE
 4             Florida Justice Institute  Inc
              2870 First Union Financial Center
 5             200 South Biscayne Boulevard
              (305)  358-2081
 6
              REPRESENTING THE DEFENDANTS
 7
              MAXINE B  RYAN, ESQUIRE
 8             KATHLEEN SAVOR, ESQUIRE
              Office of the Attorney General
 9             110 E E  6th Street
              Ft  Lauderdale  Florida 33301
10             (954) 712-4600

11                    * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

              ACCURATE STENOTYPE REPORTERS, INC
```

## PAGE 4

```
                                                              4
 1            P R O C E E D I N G S

 2     The following deposition of DR  JANICE SPANN taken

 3   on oral examination  pursuant to notice  for purposes of

 4   discovery  and for use as evidence  and for other uses

 5   and purposes as may be permitted by the applicable and

 6   governing rules   Reading and signing of the deposition

 7   transcript by the witness is not waived

 8                    * * *

 9   THEREUPON,

10            DR  JANICE SPANN

11   was called as a witness  having been first duly sworn

12   was examined and testified as follows

13            DIRECT EXAMINATION

14   BY MR  SIEGEL

15     Q    May we have your full name, please

16     A    Janice Spann  Janice B  Spann

17     Q    By whom are you employed?

18     A    Department of Corrections

19     Q    How long have you been employed by the

20   Department of Corrections?

21     A    Five and a half years

22     Q    You re a medical doctor?

23     A    An internist

24     Q    Are you board certified?

25     A    Yes  sir

              ACCURATE STENOTYPE REPORTERS  INC
```

DEFENDANT'S
EXHIBIT

5

NANCY P  VETTERICK, CCR, RPR   (850)878-2221

SHEET 09 PAGE 17

17

1    A    Penile edema  If you've managed to expose
2  yourself right at the time they spray and it hits full
3  on the penis  it gets four times the normal size  I can
4  swear to that  I have seen one case in five and a half
5  years  a very impressive penile edema  I'm sorry  I'm
6  being funny  but you asked
7    Q    And you answered
8    A    You shouldn't ask things like that where we're
9  at  Those guys are crazy  You wouldn't do that  not a
10  normal person
11    Q    Have you had an opportunity to observe any
12  other kinds of injuries as a result of the use of
13  chemical agents?
14    A    No  I haven't seen anything more than local
15  reactions  and that penile edema I'm sure is sensitive
16  skin
17    Q    Are there people  who from a medical
18  perspective  pepper spray cannot be used on?
19    A    Not that I'm aware of  I guess if you had
20  severe coronary disease and stuff like that  you'd be
21  leery  but we don't have very many that are older  age  so
22  very few of ours qualify  They're usually young men
23    Q    Is the use of pepper spray a problem for
24  somebody with asthma?
25    A    No  I've got probably 100 guys that are

ACCURATE STENOTYPE REPORTERS  INC

19

1    Q    Besides what you've called pepper spray, do
2  they use any other kind of chemical agents?
3    A    Not that I'm aware of  As far as I can tell
4  they're using regular pepper spray
5    Q    Have you noticed any impact on the physical
6  health of close management inmates because they're in
7  close management?
8    A    Not really
9    Q    How is the muscle tone of close management
10  inmates as compared to general population inmates?
11    A    I do EOS physicals  and some fellows leaving
12  look like a model for -- you know  they really are
13  muscular from working out  and others are like me  They
14  look like a desk jockey with flabby bellies  It depends
15  on the inmate and how motivated he is
16       I've got them that have physiques  and you
17  swear that they've been weight lifting  and they
18  basically have been weight lifting with every possession
19  they own wrapped up into their mattress  weight lifting
20  every day
21       You're talking squats  you know  400 squats in
22  the morning and 400 squats in the afternoon  so when I
23  see a strain  they've been active  very active if they're
24  motivated
25    Q    Do the EOS physicals include any mental health

ACCURATE STENOTYPE REPORTERS  INC

PAGE 18

18

1  listed as asthmatic  and probably 30 in CM  and they all
2  get sprayed unless their asthma is bad enough to warrant
3  regular nebulizer treatments  No  It doesn't affect
4  their asthma
5    Q    Would it affect it if they require regular
6  nebulizer treatments?
7    A    I wouldn't have them back there if they were
8  getting regular nebulizer treatments  They would be back
9  in the infirmary  I don't have anyone currently getting
10  regular nebulizer treatments in CM  thank the Lord
11    Q    Is there anybody in CM who has to use an
12  inhaler?
13    A    Most of the 30 that are back there are
14  probably using inhalers  and usually two inhalers or more
15  per inmate
16    Q    As far as you know, from a medical
17  perspective  the chemical agents that are used don't have
18  any adverse impact because somebody has asthma?
19    A    No  I have not seen any
20    Q    Are there any other kinds of medical
21  conditions that would indicate that chemical agents
22  should not be used?
23    A    The only one I'm aware of is severe coronary
24  disease  I don't think it would be a good idea if
25  somebody is that unstable

ACCURATE STENOTYPE REPORTERS  INC

PAGE 20

20

1  component?
2       MS  RYAN  Objection as to form  You can
3  answer
4       THE WITNESS  I do the EOS physicals  and all
5  we ask is  are you on medication  and if they're on
6  mental health medication  then I'll look back to
7  verify if psych has written them  I do just a
8  brief to make sure they know to check in at the
9  mental health center in their area
10       That's the extent of counseling that I give
11  I don't know what the nurse does
12  BY MR  SIEGEL
13    Q    Do you actually do a physical exam of people
14  who are leaving?
15    A    A very brief review of the records and a very
16  brief heart and lungs  or if a complaint that's addressed
17  like I've got an ear that's stuffy  I'll look at the ear
18  It's very focal  It's mainly to make them aware of their
19  health needs when they leave
20    Q    Do you know if mental health does any kind of
21  mental health exam as part of an exit process?
22       MS  RYAN  Objection as to form  You can
23  answer
24       THE WITNESS  I don't know
25  BY MR  SIEGEL

ACCURATE STENOTYPE REPORTERS  INC

DOC/LEGAL SERVICES    Fax:850-922-4355

# DEPARTMENT OF CORRECTIONS
## ISSUE PAPER
## CLOSE MANAGEMENT CONSOLIDATION PLAN

**I - Objective**

In order to maximize access to appropriate healthcare and enhanced program activities, the **male** close management population will be consolidated from the current (14) **fourteen sites** to (3) **three** The relatively few female close management inmates are housed at Dade CI

**II - Current Situation**

Until recently, the current **male** close management population was housed in 14 institutions throughout the state Since 1999, the population has declined from around 3,400 to approximately 2,400 inmates and the department has been able to proactively consolidate the number of close management institutions to nine

**Wellness programming** currently provides the following services to the close management inmate population -- close management physical fitness program, wellness education, personal fitness, wellness education puzzles, Fresh Start Tobacco Cessation programming

**Education:** Currently provides an effective curriculum for all close management inmates from PACE Cabinet programs  All inmates receive cell front instruction and CM III inmates receive out of cell instruction in groups of up to ten

**Chaplaincy**  Chaplains or approved volunteers make weekly rounds to all CM inmates for cell-front visitation  Chaplains also provide emergency counseling services surrounding family emergencies

Appropriate and medically necessary **healthcare,** including physical, mental and dental care is currently provided to the existing population

**III - Action**

Move the current close management population housed in 14 state institutions to 3 -- Santa Rosa, Florida State Prison and Charlotte  These institutions will have a combined close management capacity of 3,024  Renovations have already begun at Florida State Prison with a scheduled completion date of June 30, 2001

**IV - Definitions of Applicable Terms**

**Close Management**·  The confinement of an inmate apart from the general population for reasons of security, or the order and effective management of the institution, where the inmate, through his/her own behavior, has demonstrated an inability to live in general



DEFENDANT'S
EXHIBIT
**6**

1

population without abusing the rights and privileges of others  These inmates are restricted to inside a secure perimeter and only leave this perimeter in restraints and/or under armed supervision

**Medical Grade**  An overall functional capacity by which inmates are assigned to an institution  The medical (X) grading system ranges from X-1 through X-4, the latter indicating severe medical conditions or physical impairments that require assignment restrictions to ensure continuous monitoring of that condition or conditions

**Mental Health Grade**  Assignment of mental health status upon incarceration. Mental health grades range from S-1 through S-5, the latter noting assignment to a Crisis Stabilization Unit or to the Corrections Mental Health Institution (CMHI), the long-term care psychiatric hospital operated by the Department  The mental health grade is a subset of the overall functional medical grade, but the treatment and housing requirements of the mental health grade may take precedence over the functional grade

**S-1:**  Is the classification which indicates no significant impairment in the inmate's ability to adjust within an institutional environment due to the absence of an Axis I disorder, personality disorder, or mental retardation

**S-2:**  Denotes mild impairment in adaptive functioning within general inmate housing which is associated with an Axis I disorder, schizotypal and borderline personality disorders, or mental retardation  The impairment is not so severe as to prevent satisfactory adjustment in general inmate housing with appropriate case management and brief psychological counseling

**S-3:**  Denotes moderate to severe impairment in adaptive functioning due to the above-mentioned disorders  The impairment is not so severe as to prevent satisfactory adjustment in general inmate housing with case management, group and/or individual counseling, and psychiatric consultation  Clinical management of the disorder may require at least periodic administration of psychotropic medication, although the inmate may exercise his/her right to refuse the medication

**S-4:**  This classification denotes assignment to a Transitional Care Unit (TCU) and can only be assigned or changed by a psychiatrist at a TCU  A multidisciplinary team will tailor a treatment plan to the inmate's specific needs and limitations

**S-5:**  This classification denotes assignment to a Crisis Stabilization Unit (CSU) or to the Corrections Mental Health Institution (CMHI), the long-term care psychiatric hospital operated by the Department  This classification can only be assigned or changed by a psychiatrist at a CSU or at CMHI  A multidisciplinary team will help the inmate recover from a psychiatric emergency situation, such as suicide attempt, psychotic break, or severe loss of behavioral control

## V - Plan/Policy Issues

### Security

- Enhance security staffing in the CM dormitory for more frequent officer-inmate interaction and observation

2

- Increase security escorts in outside exercise/recreation from 3 hours once a week to 2 hours three times a week

- Increase escorts to allow for one two-hour contact or non-contact visit weekly for all CM inmates

- Enhance security escort and supervision availability for mental health groups and individual sessions

- Provides increased escort and supervision for education, self-betterment, enrichment programs

- Provide cordless phones, controlled and distributed by officers, to facilitate inmate phone access in accordance with status (not currently allowed)

- Increase book and reading material exchanges by inmates

- Provide six restricted labor squads to involve 180 inmates in daily outside work activities for six hours per day

- Provide twenty-two existing work squad officers to supervise other work program activities within the three institutions

### Programs
*The following will be provided to enhance the current delivery of education/programs to the close management population*

- Provide cell-front basic educational services at standard ratio of one teacher to every 160 inmates. The primary method of instruction will be individual in nature

- Provide an effective curriculum for all close management inmates from PACE Cabinet programs and a closed circuit video program delivery system

- Provide all three levels of CM in-cell cognitive behavioral change programming via a closed circuit video delivery system with cell-front instruction and follow up

- Provide CM III with out-of-cell programming within groups up to ten. CMII & CMIII inmates will be given job assignments

- All inmates will be instructed in the principles of Wellness and encouraged to practice behaviors that will lead to positive outcomes in the five dimensions of Wellness: physical, emotional, intellectual, social and spiritual

- Required equipment will be provided by the Inmate Welfare Trust Fund

3

### *Mental Health Services*

*Timely and appropriate mental health evaluation and treatment services will be provided to close management inmates as follows.*

- Evaluate (health record review and if indicated, clinical interview) each inmate prior to placement in close management to determine whether inpatient mental health care is needed in lieu of placement

- Monitor mental functioning of each close management inmate through weekly rounds at cell front, and through periodic (e g , every 14, 30, or 90 days) clinical interview conducted out of cell

- Provide outpatient psychiatric evaluation as necessary

- Provide full range of outpatient treatment services (e g , psychiatric follow-up, psychotropic medications, individual and group counseling/therapy) commensurate with clinical need and appropriateness   These services will be provided in three (3) levels of intensity as follows

  - Service Intensity Level I  CM inmates classified as S-2

  - Service Intensity Level II  CM inmates classified as S-3 whose mental and behavioral functioning is stable

  - Service Intensity Level III  CM inmates classified as S-3 whose mental or behavioral functioning is unstable, as manifested for example by presence of residual mental symptoms and/or adjustment problems (e g , rule violations)

- Refer inmates requiring care more intense than the above to inpatient units (transitional and crisis stabilization units)

## VI – Resource Requirements

Attached

4

## DEPARTMENT OF CORRECTIONS
## CLOSE MANAGEMENT CONSOLIDATION PLAN

| | Fiscal Year 2000 – 2001 FSP – Phase I | Fiscal Year 2001 – 2002 FSP – Phase II | FSP 08/01/2002 | Fiscal Year 2002 - 2003 Santa Rosa 05/01/2003 | Charlotte 05/01/2003 |
|---|---|---|---|---|---|
| Capacity | - | - | 1,074 | 1,170 | 780 |
| Psych I/II | - | - | - | 1,170 | 780 |
| Psych III | - | - | 1,074 | - | |
| **FTE** | | | | | |
| Security | $ - | $ - | $ 66 | $ 42 | $ 28 |
| Programs | - | - | 11 | 8 | 6 |
| Health | - | - | 51 | 22 | |
| Position Costs | - | - | | | |
| Security | | | 2,403,450 | 278,513 | 186,199 |
| Programs | | | 373,834 | 50,595 | 37,246 |
| Health | | | 2,941,755 | 230,992 | - |
| Position Costs | | | 795,768 | 235,059 | 82,132 |
| | $ - | $ - | 128 $ 6,514,807 | 72 $ 795,159 | 34 $ 305,577 |
| Health Services Expense - private vendor | | | | | $ 348,228 |
| **Physical Plant Requirements** | | | | | |
| 1 Office space | $ 118,000 | $ 133,650 | $ | $ 144,000 | $ 154,000 |
| 2 Classroom/group treatment space | 202,500 | 581,000 | | 216,000 | 202,500 |
| 3 Exercise/recreation areas | - | 200,000 | | 300,000 | 172,500 |
| 4 Visual screens | - | - | | 10,000 | 15,000 |
| 5 Wiring surfaces in cells | - | 53,700 | | - | - |
| 6 Upgrade to infrastructure | 329,000 | - | | - | - |
| 7 Construction costs | - | - | | 462,000 | 462,000 |
| | $ 649,500 | $ 968,350 | $ | $ 1,132,000 | $ 1,006,000 |
| **Equipment and supply requirements** | | | | | |
| 1 Furniture & equipment for 2) above | $ - | $ 247,000 | $ | $ 112,000 | $ 108,000 |
| 2 Install telephones | - | 26,300 | | 11,650 | 11,235 |
| 3 Health Services materials | - | 25,000 | | 25,000 | 25,000 |
| | $ - | $ 298,300 | $ | $ 148,650 | $ 144,235 |
| **Total funding requirements** | $ 649,500 | $ 1,286,650 | $ 6,514,807 | $ 2,075,809 | $ 1,804,040 |
| **Total Fiscal Year Funding requirements** | $ 649,500 | $ 1,286,650 | 234 $ 10,394,656 | | |

Note: Healthcare at Charlotte CI is provided by a private vendor. In lieu of FTE, equivalent salary and related costs are being requested to assist the vendor in meeting the requirements of the plan. The staffing requirements at Charlotte are the same as at Santa Rosa.